OPINION OF THE COURT
Lori Currier Woods, J.
A trial of these matters was held on September 22, 2015, September 24, 2015, September 29, 2016, October 13, 2016, October 18, 2016, October 19, 2016, October 20, 2016, October 21, 2016, October 25, 2016, October 27, 2016, October 28, 2016, November 1, 2016, November 3, 2016, November 17, 2016, November 18, 2016, December 6, 2016 and December 7, 2016.' The following parties were present on each date: FG, together with his attorney(s) Michael Meth, Esq., and/or Bianca Formi-sano, Esq., JP, together with his attorney Peter Bloom, Esq., RPF, together with her attorney Sheila O’Donnell, Esq., and the attorney for the subject children Ariana Antonelli, Esq. The court heard testimony from the following individuals: JP, RPF, FG, Dr. Mednick, Ph.D., DABPS, and Andrea M.
*644 This court has presided over hundreds of custody cases, none of which have been as contentious, embittered or prolonged as the case at hand. The facts of this case, which has been pending before this court for over two years, are like none that have ever been presented before this court, and are relatively new to the changing landscape of child custody in the State of New York. The trial of the pending petitions spanned over the course of 17 days and was delayed for one year due to the numerous appeals that were filed by FG and the subsequent stays that were issued as a result thereof. To further add to the complexities of this case, during the time in which the appeals were pending and the stays were in effect, the New York State Court of Appeals issued its decision in Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d 1 [2016]), wherein it overruled its decision in Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]), which held that a parent was defined either through biology or through a legal adoption and that equitable estoppel would not be recognized as a means to establish parentage. In Matter of Brooke S.B., the Court of Appeals acknowledged that the rule as set forth in Alison D. v Virginia M. was adverse to the best interest of a child and held that in the case of an unmarried couple who planned to have a child, the nonbiological/ nonadoptive parent can achieve standing by establishing, by clear and convincing evidence, that there was a (pre-conception) agreement to conceive and raise a child together. In light of the Court of Appeals’ ruling in Matter of Brooke S.B., and after taking into consideration the testimony that was heard in the standing proceeding in the instant case, the Appellate Division affirmed this court’s decision which granted standing to JP one year earlier, lifted any remaining stays that were still in effect and referred the matters back to this court for continuation of the best interest hearing. The parties have appeared before this court on occasions too numerous to count over the past two years and during the course of the best interest hearing. In that time, this court has had the unique opportunity to hear from the parties and to assess their credibility, temperament and sincerity.
Although the court has been presented with vastly different versions as to what transpired between the parties, certain facts remain undisputed. At the time that JP and FG, two men, met and began dating, neither one of them had children. JP and FG became involved in a relationship with one another and expressed to each other their desire to have children. Both *645 men preferred to have children who were genetically related to them. JP facilitated the meeting between FG and RPF and it was agreed that FG would donate his sperm and RPF would donate her eggs and carry the children. This court credits the testimony of JP and RPF that described how, in agreeing to donate her eggs and carry the children, RPF was fulfilling a promise that she had made to her brother years ago, so that he could have children who would be genetically related to him. This court discredits FG’s claims that RPF was merely his surrogate and carried the children for him alone. This court finds that but for a promise that she made to her brother, RPF would have never agreed to endure in vitro fertilization (IVF) treatment and a twin pregnancy solely for FG’s benefit.
It is undisputed that soon after reaching their agreement for conception, the parties began the process of IVF and RPF became pregnant with the subject children. It is undisputed that the parties entered into a surrogacy contract. This court finds that the parties entered into the surrogacy contract with the understanding that JP would adopt the children and that RPF would surrender her parental rights to the children but would nevertheless remain an active part of their lives. Although such contracts are not valid in the State of New York, the testimony before the court established that an attorney prepared the contract and that the parties believed the contract to be valid and legally binding at the time that they entered into it. This court finds that the contract serves as evidence of the original intent of the parties, which was for JP to adopt the children so that he and FG could raise them together, and for RPF to never be cut out of their lives.
This court finds that as the pregnancy progressed, both FG and JP attended medical appointments with RPF, paid her bills as she was on disability and unable to work, paid for renovations to her home and assisted her and her children in various ways. RPF gave birth to the children in 2010 and JP and FG were present for the births. The children were given names that incorporated the names of both men, to wit: GPG and LPG, which this court finds to be further evidence that the intent was always for JP and FG to be the parents of the children and to raise the children together.
The court finds that JP, FG and the children lived together as a family for the first four years of the children’s lives. The court further finds that during these first four years both men were actively involved in caring and providing for the children *646 on a daily basis as their parents. Indeed, FG, JP and the children lived as a typical family would, sharing parenting responsibilities, milestones and celebrating special occasions together, including holidays, birthdays and family celebrations, as evidenced by the numerous holiday cards, Father’s Day cards and gifts which the parties and children exchanged and which are now in evidence. The court further finds that the children have very strong attachments to FG and to JP and regard both men as their parent, referring to FG as “daddy” and to JP as “dada.” This court finds that JP was actively involved in the children’s lives until 2014, when FG cut off all contact to the children and subsequently made the unilateral decision to remove the children from the State of New York.
This court finds that much of the testimony revolved around FG’s claims that JP solicited sex online with strangers which in turn endangered the safety of the children. The court notes that JP vigorously refutes these claims and argues that FG installed the sexual material on his computer. Both men admitted to cheating on one another during the course of their relationship. Indeed, FG admitted that he had a one-night stand with individuals that he met online. Although the parties may have engaged in indiscretions which caused the other pain throughout their relationship, this court is not concerned with who stepped outside of the relationship and rather, is solely concerned with what is in the best interest of the children. This court finds that there is no evidence in the record to establish that there is any truth to FG’s claims that JP endangered the children or that JP and/or RPF are dangerous or harmful to the children. Upon reviewing the facts and circumstances surrounding this case, and upon reviewing the testimony and evidence that is before this court, this court finds that much if not all of FG’s testimony was self-serving, insincere and incredible. And while this court has no doubt that FG has an immeasurable amount of love for the children, this court finds that his undeniable need to be in control drove bim to engage in a series of selfish and destructive actions that were by no means in the best interests of the children, and which only served to promote his own interests.
Relocation to Florida
FG is requesting permission from this court to relocate with the children to the State of Florida. His application for relocation was filed with the court after he had already removed the children from New York State without any prior notice to the *647 parties or without receiving the permission of any court in the State of New York. When reviewing a custodial parent’s request for permission to relocate, the court’s primary focus must be on the best interests of the child. (See Matter of Steadman v Roumer, 81 AD3d 653 [2d Dept 2011].)
“Although each custodial parent’s request for relocation must be decided on its own merits, the factors to be considered include, but are not limited to, each parent’s reasons for seeking or opposing the move, the quality of the relationships between the children and each parent, the impact of the move on the quantity and quality of the children’s future contact with the noncustodial parent, the degree to which the lives of the custodial parent and the children may be enhanced economically, emotionally, and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and the children through suitable visitation arrangements.” (See Matter of DeCillis v DeCillis, 128 AD3d 818, 820 [2d Dept 2015]; see also Matter of Said v Said, 61 AD3d 879 [2d Dept 2009]; Matter of Tropea v Tropea, 87 NY2d 727 [1996].)
This court notes that it has been held that the strict application of the aforementioned factors is not required in the context of an initial custody determination, such as in the case at hand. (See Matter of Santano v Cezair, 106 AD3d 1097 [2d Dept 2013].) Notwithstanding, this court will consider the factors in regard to FG’s request for relocation.
Reasons for/against the Relocation
FG makes a number of arguments in support of his request to relocate to the State of Florida. To begin, he argues that the State of New York does not have enough income opportunities and that there is a tremendous amount of income potential for him in Florida. FG stated that during the time that he lived in Florida, he worked as a realtor selling mostly luxury homes. He stated that he earned more money in Florida because realtors in Florida are paid faster and receive larger commissions as compared to realtors in New York. He stated that Florida has more luxury homes than New York and that more people are moving to Florida. FG also stated that he and his fiancé started two businesses in Florida which are doing very well. FG stated that much of his family, whom he considers to be his support system, now lives in Florida. He stated that the chil *648 dren enjoy spending time with his family and will not be able to do so as often if they are not permitted to relocate to Florida. FG argued that the schools in Sarasota, Florida are specialized and offer more extracurricular activities. He stated that he hopes that the children will be able to attend the Pine View School, which is a school for gifted children in Sarasota, Florida. FG argued that the cost of living and extracurricular activities are more expensive in New York than in Florida. He argued that his monthly expenses will be higher if he has to live in New York. Lastly, FG argued that Florida is just a happier place to live, as it has palm trees and beaches.
JP and Ms. RPF both oppose the relocation request. They argue that New York State is the children’s home state and is where the children belong. They argue that the children spent the first four years of their lives in New York until FG took them away and cut off all contact. They argue that they have already missed out on a substantial amount of time with the children that they will never get back and argue that if the children reside in Florida they will not be able to be an active part of the children’s lives.
This court finds that FG has failed to demonstrate how a relocation to Florida will be in the children’s best interests and further finds that he has failed to establish that the children’s lives will be enhanced economically, emotionally and educationally by the proposed move. FG argues that New York does not have sufficient income opportunities for him. This court finds this argument to be without merit and, in fact, unavailing. By his own testimony FG established that he was able to achieve much financial success in New York, particularly in Orange County. During his time in Orange County he owned several different businesses and purchased several different homes. Indeed, so successful was he with his business endeavors in New York that he was able to live off of his savings for years after the children were born. This court finds that any financial hardship that FG may have faced in Orange County was as a direct result of his own actions and poor decision-making, for example: his failure to make mortgage payments on homes that he owned even though he was receiving rental income which, by his own testimony, produced a surplus for him. FG claims that Florida has more luxury homes and that more people are moving to Florida, but has failed to provide the court with any proof of these claims. This court finds that FG has many income producing opportunities in New York, as he *649 can easily renew his real estate license in New York and can even obtain a license in nearby New Jersey if he so chooses. What’s more, FG has proved that he has a knack for starting new businesses, particularly in Orange County. FG argues that the cost of living in Florida is less expensive than it is in New York, and while the court does not dispute this fact, the court does not find this fact to be a sufficient reason to relocate the children to Florida, especially since JP will now be sharing in the cost of the children’s expenses.
In further support of his relocation request, FG argues that many of his family members, whom he refers to as his support system, have moved to Florida. This court finds this argument to be superficial at best. FG testified that with the exception of his mother, who lives with him in Florida (and who previously resided with him in New York), his family and friends live a minimum of one hour away from him and the children. At best the children see his family members a few times a month. And although FG refers to his family as his support system for the children, he stated that he, his fiancé, and at times, his mother, are the people who care for the children. He further stated that if he has to go out he hires a baby-sitter to stay with the children—not his sister, or his aunt or uncles, despite the fact that he claims that he moved to Florida to be closer to his support system. Further, this court finds that FG would continue to have family support in New York, as he acknowledged that he has family members that continue to reside in New York, including his grandparents, whom he stated he is very close with. What’s more, he will continue to have support from his fiancé, as his fiancé, who is originally from New York, and has family in New York, has already moved back to New York with FG and the children. This court is alarmed that FG is more concerned about the children spending time with his extended family rather than with JP. It is clear that FG feels no remorse about the time that the children have missed with their dada and has no remorse about the time that they will continue to miss with their dada if they were to reside in Florida. This court finds that having meaningful contact and spending more time with JP is in the best interest of the children. The court further finds that the children can continue to spend time with FG’s family in Florida on long weekends and during school vacations when they are scheduled to be with FG. This court will not address FG’s statement that Florida is just a happier place to be because it has beaches and palm trees other than to *650 say that such a comment only serves to show the extent to which FG has trivialized and marginalized JP’s role in the children’s lives.
FG argued that the children’s lives will be enhanced educationally by living in Florida and stated that the schools in Sarasota, Florida are specialized and offer more extracurricular activities. He stated that he hopes that the children will be able to attend the Pine View School, which is a school for gifted children in Sarasota, Florida. Once again this court finds FG’s argument to be baseless and without merit. The children currently attend the Monroe-Woodbury school district in Orange County, which is known for its high quality schools. Indeed, the testimony established that JP and FG moved to Monroe, New York in part because of its high quality schools. Further, Sarasota, Florida is not the only place where the children can participate in extracurricular activities. FG stated that the children participated in drama, dance, cheerleading and karate while living in Florida. This court notes that every single one of those extracurricular activities is available in Orange County. Indeed, the children have already been enrolled in a gymnastics program in Orange County. FG also stated that he is hopeful that the children will be able to attend a school for the gifted. This court notes that it has not been provided with any information indicating that either child is gifted and has been accepted into the Pine View School or any school for the gifted. Indeed, the court has not been presented with information claiming that either child should even be enrolled in a gifted program. This court cannot grant a request to relocate more than 1,000 miles away from JP and Ms. RPF based upon FG’s hope that one day the children will be declared to be gifted and accepted into the Pine View School.
Quality of the Relationship between the Children and Each Parent
This court finds that a relocation to Florida would have an extremely negative impact on JP’s relationship with the children. It is clear to this court that the children are closely bonded to both JP and FG and view each one as their parent. This court finds that it would be in the best interest of the children to spend meaningful quality time with both FG and JP on a regular basis. The court finds that it would be in the best interests of the children for both of their parents to play an active role in their day-to-day lives. This court finds that such cannot happen if the children are living in Florida, as JP will *651 miss out on an inordinate amount of time with the children and will not be able to do the things that parents typically do with their children on a daily basis, such as giving hugs and kisses, helping them to get ready for the day, sharing meals together, helping them with their homework and bedtime routines, attending school events and extracurricular activities, and all of the many other things that parents do day in and day out with and for their children. This court further finds that a relocation would have a negative impact on Ms. RPF’s relationship with the children, as she too, will be greatly limited in her ability to be with the children.
Impact of the Move on the Quantity and Quality of the Children’s Future Contact with the Noncustodial Parent
This court further finds that a relocation to Florida would greatly restrict the quantity and quality of the children’s future contact with JP and with Ms. RPF. During the time that the children resided in Florida, FG prevented the children from having any and all contact with JP and Ms. RPF. He did not allow the children to see them, either in person or via Face-Time. He did not allow the children to speak with them, or to even send them a picture or a card. FG completely cut JP and Ms. RPF out of the children’s lives. Indeed, JP and Ms. RPF did not even know the whereabouts of the children for quite some time and were prevented from having any and all contact with the children.
The testimony established that FG directed JP to only communicate with him via his attorney and that he threatened to call the police if JP attempted to see the children. What’s more, during the course of this proceeding, FG has filed an appeal to every interim order of this court which granted JP and Ms. RPF contact and/or time with the children. He has filed emergency petitions in the State of Florida and has gone so far as to file papers with the highest court in the State of New York. In light of the foregoing, and in light of the efforts that FG has made to keep the children away from JP and Ms. RPF, even in the midst of this hearing, this court has great reason to believe that the quantity and quality of the children’s future contact with JP and Ms. RPF would be in great jeopardy should the children be permitted to relocate to Florida. Further, this court, having had the unique opportunity to assess the parties, finds FG’s claims that he will allow the children to have regular contact with the parties if the children are permitted to relocate to Florida, to be disingenuous, insincere and completely lacking in credibility.
*652 FG stated that he did not discuss the move to Florida with JP or with Ms. RPF because he had not heard from JP for six months prior to the move. He stated that it had been even longer since he had heard from Ms. RPF. In making these purely self-serving claims, FG fails to acknowledge that JP reached out to him, only for FG to threaten to contact the police if JP contacted him again or came to see the children. FG fails to acknowledge that he directed JP to address all communication to his attorney. FG fails to acknowledge that Ms. RPF had filed a petition for custody in Richmond County and fails to acknowledge that the venue would be changed to Orange County, at the request of his attorney. FG in essence would have this court believe that JP and Ms. RPF abandoned the children, which is simply not true. The court does not credit FG’s statements. What’s more, FG stated that the children did not suffer any emotional harm from the move to Florida. The court finds that this statement by FG epitomizes his inability to recognize JP as a parent to the children, his refusal to allow the children to have a relationship with JP in the future, and his inability to put the best interests of the children before his own personal desires.
Economic, Emotional and Educational Enhancement/ Feasibility of Preserving the Relationship with the Noncustodial Parent
For the reasons set forth above, this court finds that FG has failed to establish that the children’s lives will be enhanced economically, emotionally and educationally by the proposed move. Morever, and as discussed above, this court finds that there is little to no chance of preserving the relationship with the noncustodial parent should the relocation be permitted, as FG has already proved that he is not willing to allow the children to have a meaningful relationship with JP.
Overall, this court finds that relocation to the State of Florida would not be in the children’s best interests. It is clear to this court that New York State is the children’s home state. It is where the children were born and where they were raised, by their two parents, for the first four years of their lives. Most importantly, New York is where JP, their dada, is. This court finds that FG’s unilateral decision to move to Florida and to thereafter cut off all contact with the parties, particularly to JP, was detrimental to the best interest of the children. This court further finds that FG has failed to establish that the children’s lives will be enhanced in any way by a relocation to *653 Florida. Moreover, this court finds that the quality of the other parent’s relationship with the children will absolutely and unquestioningly be negatively impacted by the proposed move, as would the quantity and quality of the children’s future contact with the other parent. Accordingly, FG’s request for permission to relocate with the children is denied.
Custody
Each of the parties has filed for custody of the subject children. RPF states that although she is the biological mother of the children, she will not seek custody of the children if JP is awarded custody, as she knows that JP will allow her to have access to the children. She states that she will continue to fight for custody of the children if custody is awarded to FG, as she believes that he will continue to alienate her from the children’s lives.
FG argues that he is and has always been the primary caregiver for the children. He states that he has always been the parent who has taken care of all of their needs and who has arranged for medical appointments, early intervention services, schooling and extracurricular activities, with little help from JP, who was too busy pursuing sex with online strangers. He states that he should be permitted to remain as the children’s primary caregiver.
JP denies that he pursued sex with strangers online and argues that FG hacked into his computer and installed the sexual material. JP argues that he was an active caregiver to the children prior to FG cutting off all contact and removing the children from the State of New York. He argues that his relationship with FG was one that consisted of domestic violence, wherein FG was the dominant and controlling partner while he was the passive and submissive partner. JP argues that FG would constantly threaten to take the children away if JP did not do what he (FG) told him to do. He states that he lived in fear that FG would act on his threats to take away the children, and states that he did everything that he could to remain in the children’s lives, even if that meant confessing to accusations that he knew were not true. JP argues that his bond with the children is strong despite the years that passed with little to no contact because of the large role that he held in the children’s lives for the first four years of their lives. He states that he would never keep the children away from FG even though FG took the children away from him. He further states that he would not deny RPF access to the children and would ensure *654 that everyone who loves the children would have access to the children.
In making an initial custody determination the court must consider the best interests of the child. Factors to be considered in determining the child’s best interest include the quality of the home environment and the parental guidance the parent provides for the child, the ability of each parent to provide for the child’s emotional and intellectual development, the financial status and ability of each parent to provide for the child, the relative fitness of the respective parents, and the effect an award of custody to one parent may have on the child’s relationship with the other parent. (See Matter of Huaringa v Camargo, 138 AD3d 993 [2d Dept 2016]; Salvatore v Salvatore, 68 AD3d 966 [2d Dept 2009]; see also Eschbach v Eschbach, 56 NY2d 167 [1982].) The court’s paramount concern in this, as in any custody dispute, is to determine, under the totality of the circumstances, what is in the best interest of the children. In that regard, this court will analyze the aforementioned factors in relation to each parties’ request for custody.
Quality of the Home Environment and the Parental Guidance the Parent Provides for the Child
This court finds that all three of the parties love the children dearly and are able to provide the children with a good home environment and parental guidance. The testimony before the court established that each of the parties has his/her own home. RPF currently lives on Staten Island with her daughters. Despite the allegations of domestic violence that FG alleges took place in her home, the court does not find her home to be unsuitable or unsafe for the children. FG is currently residing in a small cottage with his fiancé and the children. He stated that the cottage is not the living arrangements that the children are accustomed to, as they lived in a three bedroom home in Florida that had a backyard and a pool. This court fully acknowledges that the cottage is not, nor was it ever intended to be, a long-term dwelling place for FG, and although the court is certain that FG will be able to find a suitable home for the children in Orange County, the court is concerned with regard to how long FG would remain in that home, as he has a tendency to frequently change residences. JP testified that he currently resides in Orange County, New York, in the same home in which he has resided since he and FG broke up in 2014. The children have a bedroom in the home and sleep on bunk beds which he purchased for them.
*655 The court finds that although RPF’s home is suitable for the children, it would not be in the children’s best interest to reside in her home. Accordingly, the court must consider who, as between FG and JP, can best provide the children with the most suitable, quality home environment. In reaching this determination the court does not just look at the physical dwelling place in which the children will reside, as each man has a safe and suitable home for the children, but must also consider which party will be able to best provide the children with the most appropriate and stable home environment.
This court finds that JP will provide the children with the most suitable, appropriate and stable home environment. This court finds that despite FG’s claims that JP has a wild and unstable lifestyle which would endanger the children, there is no credible evidence to establish that the children are or ever have been in danger while in JP’s care. Further, JP has proved himself to be quite stable. JP has lived in the same residence since he and FG separated in 2014, whereas FG has resided in four different homes and two different states within the same period of time. JP lives alone and has not resided with any other individuals since breaking up with FG in 2014. FG allowed his fiancé, who the court did not hear testimony from, to move in with him and the children within a few months of when they began dating. JP has a good paying, stable job with the Metropolitan Transportation Authority (MTA) and has held his position for over a decade. FG has had a number of different jobs over the years including being an insurance agent, a bank manager, a spa owner, a salon owner, an ice cream store owner, a dog groomer, and, most recently, a real estate agent/ house flipper. The court has no doubt that the children will have a stable and safe home environment with JP and finds that he is best suited to provide them with a quality and stable home environment.
The court finds that all three parties are able to give parental guidance to the children, and finds that each party has an important role to play in the children’s lives. During his testimony Dr. Mednick stated that he observed all three of the parties to be appropriate and loving in their interactions with the children. Dr. Mednick spoke of how FG has done a good job of organizing the children’s time and providing the children with structure and support and the court agrees that FG has done well in guiding the children and arranging for their schooling, activities and counseling. Dr. Mednick further stated *656 that JP did well at directing the children’s activities and fostering their play while engaging with each child simultaneously. He further stated that JP’s interactions with the children were quite effective from a view of effective parenting. The court, having met with the children, found them to be smart, funny and very inquisitive. And while FG no doubt had a part to play in the upbringing of the children, the court cannot ignore JP’s role in the children’s lives and his influence upon them as well. This court, having had the opportunity to observe and hear from the parties, finds FG to be a very structured individual. It cannot be denied that structure is unquestionably something that all children not only need but desire. This court finds JP to be very nurturing and loving, which is also something that all children need and desire. The court finds that although both men have somewhat different parenting styles, it was the combination of these styles that helped the children to develop into the people that they are today.
Notwithstanding the foregoing, this court shares the same concerns that Dr. Mednick expressed on the stand concerning FG and his outright refusal to recognize JP as the children’s parent. This court finds FG to be a very controlling, calculating and manipulative individual whose actions have proved that he will take extreme measures to keep the children away from both JP and RPF. FG completely disregards the fact that the children view JP as their parent and disregards the fact that the children would not exist were it not for RPF. Based on the actions that FG has taken both prior to and in the midst of this hearing, the court doubts whether he will ever be able to guide the children in accordance with what is truly in their best interest—especially when what is best for the children does not align with what is best for him.
This court notes that there will come a time when the children will seek parental guidance from RPF as well. She is their biological mother and has raised four children virtually on her own. RPF has years of experience as a parent and can offer the children guidance from a perspective that neither FG nor JP will ever have. This court hopes that both men will encourage the children to seek guidance from RPF whenever they need it.
In light of the facts and circumstances of this case, the court finds that JP is the party who is best suited to provide the children with the parental guidance that they need. JP has always made the children’s best interest his priority and has at *657 all times been guided by what was best for the children, and not himself. The court has no doubt that he will continue to guide the children fairly and in accordance with what is best for them.
Ability of Each Parent to Provide for the Child’s Emotional and Intellectual Development
This court must consider which of the parties will best provide for the children’s emotional and intellectual development. RPF has raised four children virtually on her own. The testimony before the court established that all four of her children have done well and are successful in their own right. As set forth above, FG has done well at providing the children with structure and with organizing their time. He has also done well in arranging for their schooling, extracurricular activities and therapy sessions. Although FG did not allow JP to have contact with the children when they began kindergarten or when they started attending therapy, this court has no doubt that, based upon his involvement in their lives prior to FG moving them to Florida and cutting off all contact, JP would have been actively involved in such matters had the children remained in Orange County. The court finds that each of the parties is able to provide for the children’s intellectual development. Of greater concern to this court is the parties’ ability to provide for the children’s emotional development.
FG’s blatant and unapologetic refusal to recognize JP as the children’s other parent has caused him to take drastic measures that are in no way beneficial to the children’s emotional development. FG’s actions in leaving the State of New York with the children, without so much as a word to JP, and without allowing the children to even say goodbye to JP, or to speak with him thereafter, was not in any means consistent with doing what was best for their emotional development. Indeed, Dr. Mednick stated that such actions could be equated to a child losing a parent to death and never being told the cause of death. Further, this court agrees with Dr. Mednick’s statements that if indeed FG did install the salacious sexual material on the computer, which he claims was done by JP, such an act would be indicative of sociopathic and malevolent behavior. This court cannot entrust such an individual to ensure the emotional development of the children.
What’s more, the children will undoubtedly reach a point in their lives when they will want to know about their origins. They will have questions regarding how they were born, and *658 who their mother is. These answers will need to be given to the children in a truthful and thoughtful manner. The court has great concerns as to how FG will handle these questions, especially in light of the fact that he has no regard for JP’s role in the children’s lives and absolutely no respect for RPF and the role she played in bringing the children into this world. The court worries that FG, in his never ending pursuit of keeping JP and RPF out of the children’s lives, may alter the narrative so that the children will never really know how they came to be. The court recognizes that FG stated that he will consult with counselors and will read books regarding what he will say to the children when the time comes to tell them about where they came from. However, as this court has observed, FG is calculating and manipulative and is often willing to say what he thinks the listener wants to hear, even if he has no intentions of following through with his statements. This court finds that it is FG’s actions, however, that truly show his intentions. Based upon his actions to date, this court has no basis to give credence to any of his assertions and finds that he is very likely to manipulate the truth about the circumstances in order to best suit his own emotional needs, and not those of the children. Accordingly, this court finds that JP is the parent best suited to provide for the children’s emotional and intellectual development.
Financial Status and Ability of Each Parent to Provide for the Children
This court finds that JP is the most financially stable party seeking custody of the children. The court further finds that JP is in the best position to provide for the children on a steady and consistent basis. RPF is a single mother of four. She currently resides in her home on Staten Island with her four daughters. The testimony and evidence before the court established that during the pregnancy with the subject children, RPF was placed on disability and required financial assistance from JP and FG to pay her household expenses and to pay for and make repairs to her home. The testimony further established that prior to the pregnancy she was receiving financial assistance from her father and from JP. Although RPF is no longer on bed rest and is back to work on a full-time basis, this court recognizes that she is a single parent to four other children, who continue to reside with her, and finds that of the parties seeking custody of the subject children, she is not best suited to financially provide for the children.
*659 JP is an MTA bridge and tunnel officer and has held that position for 13V2 years. He earns approximately $68,000 per year and resides in Orange County, New York. Prior to meeting FG, JP owned his own condominium on Staten Island. It is not disputed that the condominium was lost to foreclosure after he met and moved in with FG. JP has proved that he is able to provide for the children. Prior to his separation from FG in 2014, JP, in addition to caring for the children, worked a steady full-time job and contributed to the household expenses on a regular basis, virtually turning his entire paycheck over to FG. JP saw to it that the children had everything that they needed and even paid for FG’s expenses as well. Since separating from FG in 2014, JP has continued to work at the same job and has maintained his own residence. This court notes that during the separation JP attempted to send presents such as clothing to the children, but FG rejected any such gifts, even though the gifts would have been to the children’s benefit. This court further notes that any financial blemishes on JP’s record were as a direct result of his affiliation with FG and, in fact, did not occur until he began dating FG. For example, JP was able to maintain his condominium on Staten Island for years. However, after getting involved with FG, the condominium went into foreclosure. Further, the tax garnishment that was levied against JP, which he has since paid off, was a direct result of the $19,000 that he borrowed from his pension so that FG could purchase the home in Monroe, New York. Since separating from FG, JP’s financial situation has not only improved, but has stabilized.
This court is quite concerned with FG’s financial situation and doubts whether he will be able to not only achieve, but maintain financial stability in order to provide for the children. Based on the testimony before the court, it is evident that FG is apt at changing careers and starting up new businesses. As stated above, he opened his own insurance agency, worked in the banking industry, became a salon owner, a spa owner, an ice cream store owner and even became the owner of a strip mall. FG also started a dog grooming business and became a real estate agent both in New York and in Florida. He is currently involved in two start-up real estate companies in Florida. In addition to his many different business ventures, FG purchased several different residential properties in Orange County. And while all of these accomplishments are commendable, the court must look deeper. For reasons known only to *660 himself, many of FG’s business ventures ultimately came to end. FG divested himself of the salons, the day spa and the ice cream store. He no longer pursued the dog grooming business and decided that he no longer wanted to sell real estate in New York. In the course of a few years FG lost his home in Orange County, New York and the strip mall that he owned to deeds in lieu of foreclosure. FG lost another in Orange County to foreclosure. He lost yet another home in Orange County to foreclosure. He lost another home in Orange County to foreclosure. And what this court finds to be particularly interesting is that FG lost these homes to foreclosure even though they were occupied with tenants who were paying him rent. Indeed, FG testified that the rental income resulted in a monthly surplus to him and that although he continued to collect the rental income, he did not use it to pay the mortgage payments. This pattern of conduct is highly concerning to the court. FG has not been able to maintain a stable job or a home for more than a few years at a time. Further, he has a string of foreclosures, deeds in lieu of foreclosure and failed businesses trailing behind him. This court is highly concerned as to FG’s ability to remain financially stable.
Most recently FG has taken to selling luxury homes in Florida and working on his two new start-up companies, which rent and/or renovate homes and then sell them. And although FG would have this court believe that he is financially stable, his financial history as set forth above indicates a series of financial failures. Indeed, FG testified that he was unable to purchase a home in Florida because of his poor credit rating. Instead, he had to rely on his fiancé to purchase the home for him and the children. This too is concerning to the court, as the court is uncertain as to whether FG can financially provide for the children on his own or has to rely on his fiancé for financial support. If it’s the latter, the court is concerned as to what will happen if FG and his fiancé separate, as the testimony established that FG has already been unfaithful to his fiancé. What’s more, this court is concerned with regard to how FG’s latest business ventures will perform in the next few years, as he has a pattern of divesting himself of his businesses.
Overall, the court finds FG’s methods in handling financial transactions to be highly suspect, to say the least. By way of example, FG testified that at one point in time he was earning $20,000 to $30,000 per month. The court cannot begin to *661 fathom how someone who is earning said amounts each month cannot afford to pay his mortgage. The court questions the veracity of FG’s statements and the legitimacy of many of the financial transactions that he has orchestrated in the past. Accordingly, the court finds that FG is not the party best suited to establish financial stability and to provide for the children. The Relative Fitness of the Respective Parents
This court finds that JP has demonstrated that he is the party most fit to have custody of the children. JP has proved himself to be very attentive, nurturing and loving with the children. He has demonstrated that he is able to teach the children and direct their activities. JP has been a good provider for the children and is best suited to provide them with a stable home environment and with the parental guidance and financial support that they need. Further, this court finds that JP is best suited to provide for the children’s emotional and intellectual development. During all times throughout the instant proceedings, which have spanned over the course of 2V2 years, JP has always been guided by what was in the children’s best interests, and not his own. This court cannot begin to fathom the distress that JP has had to endure over the past two years. Notwithstanding whatever personal feelings he may have experienced, he has at all times been respectful of the children, never crossing any boundaries and never speaking negatively of others. He has consistently complied with the orders of this court and has been respectful of the other parties. JP has stated that he would never keep the children from FG or from RPF and the court gives much credit to this statement. Indeed, JP facilitated a conversation between the children and FG’s mother during time that the children were with JP notwithstanding the fact that FG never so much as allowed one phone call to take place between JP and the children.
This court finds that FG is not fit to have custody of the children. It has been held that one of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the noncustodial parent, and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination. It has further been held that the willful interference with a noncustodial parent’s right to visitation is so inconsistent with the best interests of the children as to, per se, raise a strong probability that the offending party is unfit to act as a custodial parent. (See Matter of Khan-Soleil v Rashad, 111 AD3d 728 [2d Dept 2013].)
*662 To say that FG has willfully interfered with and prevented meaningful contact between the children and JP is a tremendous understatement. The actions that FG has taken to keep the children away from JP are among the most extreme that this court has seen with regard to parental interference. FG does not dispute that the children spent the first four years of their lives living with him and JP as a family. He does not dispute that the children were named after JP, or that he and JP agreed to raise the children together. He does not dispute that JP was to adopt the children or that the children know JP as dada. Nonetheless FG set about on a course of action to slowly assert his dominance and control over not only JP, but the children as well. In setting about these actions, FG put his need to maintain control and distance himself from JP ahead of the children’s best interests.
This court finds that FG clearly recognized that, as the biological father of the children, he was in a unique legal position in which to assert power, dominance and control over the parties, particularly JP. Whenever he and JP argued, FG would threaten to take the children away from JP, who, in turn, would give in to FG’s demands, however outlandish. FG clearly manipulated both JP and RPF with regard to the adoption of the children and the filing of the papers with the court, repeatedly stalling the process and lying to JP and RPF about the status of the adoption. Time and time again FG took control of the situation and manipulated scenarios so as to best position himself against JP and RPF.
Although this court is unable to say with 100% certainty who installed the sexual material onto the computer, which FG claims is the basis for his decision to keep the children away from JP, the court notes that JP vehemently denies that he is responsible for that material. As stated above, the court finds JP to be a credible witness. The court further notes that the testimony established that FG was clearly the more technologically savvy partner in the relationship and that he admitted that he used the Internet to find individuals to have sex with when he cheated on JP. FG further admitted to installing an application on JP’s cell phone, without any notice to, or permission from, JP, in order for FG to monitor JP’s text messages. If in fact FG did install the material on the computer, he is undoubtedly unfit to serve as the custodial parent.
FG’s threats to interfere with JP’s contact with the children ultimately came to fruition in 2014 when he refused to allow *663 JP to see the children and threatened to call the police if JP came to see the children again. FG quietly removed the children from the State of New York without any prior notice to JP or to RPF. He then refused to disclose the children’s whereabouts and cut off any and all forms of communication with the children. This court is highly alarmed at the ease with which FG used the children as weapons to hurt JP and to further his own interests. This court finds that in using the children in this manner, FG showed no regard for what was best for the children and only did what was best for himself. To date he has shown no remorse for his actions. To the contrary, FG continues to take any and all steps to interfere with JP’s contact with the children. FG has refused to turn the children over on time for court ordered visitations with JP. He has interfered with JP’s FaceTime calls with the children and even insisted on remaining in JP’s therapeutic visitation sessions with the children. FG has objected to every order that this court has issued which granted JP contact with the children and has filed an appeal of every such order. FG has even gone so far as to seek a stay of these proceedings in the Court of Appeals and to file an emergency application in the State of Florida.
This court finds FG’s actions to be abhorrent and damaging to the children, and further finds that there is absolutely no basis for these actions. Even if FG’s accusations against JP are true, and JP did pursue sex with strangers online, such actions are not enough to deprive JP of having contact with the children. JP has never demonstrated characteristics of someone who has a sex addiction, such as an inability to function in life or maintain relationships. To the contrary, JP has maintained steady employment and a home. He has maintained a close relationship with his family and has never given up on his efforts to have a relationship with the children. Further, and assuming the allegations are true, there is no evidence that the children were ever exposed to any of these alleged sexual encounters.
As set forth above, one of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the noncustodial parent. The court has taken into consideration which party is most willing to assure that such meaningful contact between the children and the other parent takes place and finds that JP is that party. FG has proved by his actions that he is not willing to allow for meaningful contact *664 to take place between the children and JP or RPF. The court notes that although he testified that he would indeed facilitate such contact, this court finds said statements to be disingenuous at best, as his actions have shown that he will stop at nothing to ensure that he keeps JP and RPF away from the children.
This court agrees with Dr. Mednick’s statements that FG has exhibited malice by using the law to deprive the children from having an emotional development and attachment to JP, and that regardless of the issue of legal standing, which has since been established by the Court of Appeals, there is a moral issue about refusing to acknowledge another individual’s parenthood, particularly when the intention was to parent the children together and where that individual has acted and behaved as the parent, as JP has done. The court finds FG’s actions to be inconsistent with the best interests of the children and finds that a strong probability has been raised that FG is unfit to act as the custodial parent of the children.
The Effect an Award of Custody to One Parent May Have on the Child’s Relationship with the Other Parent
As stated above, this court finds that JP is best suited to be the custodial parent. This court finds that JP will ensure that the children will always have meaningful contact with both FG and RPF and that neither one will ever be cut out of the children’s lives. The court finds that FG is unfit to act as the custodial parent. The court further finds that if FG were to be granted custody of the children, he would continue to interfere with the children’s contact with the noncustodial parent—as he has done for over two years and is continuing to do to date.
The court is not only alarmed by, but is also saddened by the actions that FG has taken over the last two years, and finds that at no point did he act in the children’s best interests. Instead, he chose to do what was most convenient for him, and in doing so, took the children away from their parent and denied them access to him for years, without ever having given them the opportunity to say goodbye. He denied the children the love that their father so desperately wanted to give them, and in doing so robbed them of memories and experiences that they will never be able to recreate.
Although this court is not able to give back that time to JP and the children, it can ensure that going forward, the children will be able to have the ability to have meaningful access to each one of the parties, as that is what is truly in their best *665 interest. This court finds that these children have a beautiful and unique story. They were brought into this world because they were loved by three people, not just two, who came together to make what was once a dream into a reality. Each adult played an important role in bringing the children into existence and in raising them, and as the children get older, each one of these adults will continue to play an important role in the children’s lives. These relationships must be protected, cherished and respected, as that is truly what is in the best interest of the children. This court finds that an award of sole legal and physical custody to JP is in the children’s best interests. This is not a decision that this court has made lightly. However, it has become quite apparent that this is not a situation in which a joint custody arrangement would work, as the relationship between the parties is so embattled and embittered that joint decision-making is impossible. (See Matter of Grasso v Grasso, 51 AD3d 920 [2d Dept 2008].)
Now, upon due deliberation and after considering the testimony and evidence presented, and the court having searched the statewide registry of orders of protection, the sex offender registry and the Family Court’s child protective records, and having notified the parties and counsel, and the court having considered and relied upon the results of these searches in making this decision, accordingly, it is hereby adjudged that it would be in the best interest and needs of the minor children to have sole legal custody and sole physical custody awarded to JP; it is therefore ordered that JP’s petition for custody is granted in its entirety with the exception of his request for attorneys’ fees, which shall be determined by this court upon written submission of the application; and it is further ordered that JP shall have sole legal custody and sole physical custody of the children GPG (date of birth 2010) and LPG (date of birth 2010); and it is further ordered that JP shall have final decision-making authority pertaining to the children including but not limited to all medical, educational and religious decisions, after full and meaningful discussion with FG; and it is further ordered that FG shall have the following parenting time with the children:
1. Every Wednesday after school, or, if school is not in session, at 3:00 p.m., to Thursday morning at school, or, if school is not in session, to JP’s home at 10:00 a.m.;
2. Commencing Friday, February 24, 2017, alternating weekends from Friday after school or, if school is not in ses *666 sion, at 3:00 p.m. to Monday morning at school, or, if school is not in session to JP’s home at 10:00 a.m.
It is further ordered that there shall be such other and further visitation as agreed upon between the parties; and it is further ordered that RPF shall have access to and contact with the children when the children are scheduled to be with JP and as agreed upon between her and JP; and it is further ordered that JP and FG shall be entitled to reasonable contact with the children via telephone, Skype or FaceTime, when the children are with the other party. If the children are unable to answer, the party with the children shall ensure that the children timely return the call. Such contact shall be of age-appropriate reasonable length and shall occur sometime between 7:00 p.m. and 8:00 p.m. The children shall be given privacy for their contact with each party and shall not have their telephone calls take place via speakerphone; and it is further ordered that there shall be the following holiday parenting time:
Easter (defined as 10:00 a.m. to 7:00 p.m.) shall be with JP in odd years and with FG in even years;
Fourth of July (defined as noon on July 4th to noon on July 5th) shall be with FG in odd years and with JP in even years;
Thanksgiving (defined as after school on the Wednesday before Thanksgiving Day to 7:00 p.m. on the Friday following Thanksgiving Day) shall be spent with FG in odd years and with JP in even years;
Christmas Eve (defined as noon on the Eve until noon on Christmas Day) shall be spent with JP in even years and with FG in odd years;
Christmas Day (defined as noon on Christmas Day until noon on December 26th) shall be with FG in even years and with JP in odd years;
New Year’s Eve/New Year’s Day (defined as noon on December 31st to noon on New Year’s Day) shall be with FG in even years and with JP in odd years;
Father’s Day (10:00 a.m. to 7:00 p.m.) shall be spent with JP in odd years and with FG in even years;
Mother’s Day (10:00 a.m. to 7:00 p.m.) shall be spent with JP in even years and with FG in odd years;
Any Monday holiday not otherwise specified herein shall be spent with the parent who has the children the weekend immediately preceding the holiday; and
*667 The parties shall alternate Halloween visitation which shall be defined as Halloween day from 4:00 p.m. until 8:30 p.m., with JP having Halloween parenting time with the children in all odd number years and FG having Halloween parenting time with the children in all even numbered years.
It is further ordered that the holiday parenting time shall supercede regularly scheduled parenting time; and it is further ordered that FG shall immediately provide to JP the social security cards of each child; and it is further ordered that JP shall add the children to his health insurance plan as provided by his employer; and it is further ordered that upon receipt, JP shall provide FG with a current health insurance card for the children, or, if such is not available, a photocopy of the children’s health insurance cards; and it is further ordered that JP shall keep FG apprised of the provider names; and it is further ordered that JP and FG shall each enjoy two non-consecutive and uninterrupted weeks of vacation with the children with each providing notice of their vacation to the other 30 days prior to the vacation; and it is further ordered that JP and FG shall each provide the other with notification of all overnight trips with the children at the time that the trip is planned. A detailed itinerary shall also be provided including but not limited to, location of destination(s) with an address(es), land-line phone number(s) if available, cell phone numbers, intended date of departure, intended date of return, and any other travel information if the trip involves multiple destinations. If the overnight trip involves a flight or flights, then all flight information shall be provided; and it is further ordered that the parties shall enroll in the parenting solutions program (commonly referred to as the parent coordinator program) offered at the Dispute Resolution Center within 10 days from the date of this decision and order; and it is further ordered that each party, upon enrollment in the parenting solutions program, shall pay a retainer of $475 to the Dispute Resolution Center within 10 days of the date of this order and shall split the cost thereafter; and it is further ordered that the parties will take any dispute regarding the provisions of this decision and order and/or disputes regarding parenting time to the parenting solutions program and will be bound by the determination made by the program representative; and it is further ordered that none of the parties herein shall make any derogatory comments about the other parties, nor shall any party allow any individual to do so in the presence of the children; and it is further *668 ordered that the parties shall comply with the children’s bill of rights, a copy of which is annexed hereto and made a part hereof; and it is further ordered that the parties shall communicate about issues involving the children by text or email unless there is an emergency and in such case a telephone call shall be made; and it is further ordered that JP and FG shall have access to the health, education and welfare records of the children by copy of this order, as well as access to the children’s providers; and it is further ordered that JP and FG shall both be listed as emergency contacts with the children’s providers, schools, day care, camps and/or extracurricular activities; and it is further ordered that the parties shall keep one another updated as to a current address and telephone number; and it is further ordered that JP shall ensure that the children are enrolled in counseling and that they remain in counseling until successfully discharged; and it is further ordered that JP shall provide Ariana Antonelli, Esq., the Attorney for the Children, with the name and telephone number of the children’s therapist and shall provide Ms. Antonelli with any releases necessary for her to receive updates from and/or be able to communicate with the children’s therapist; and it is further ordered that JP and FG shall enroll in individual counseling/ therapy within 10 days from the date of this order and shall continue with said counseling/therapy until successfully discharged; and it is further ordered that FG’s request to relocate to the State of Florida is hereby denied in its entirety; and it is further ordered that FG’s petition for custody is hereby denied in its entirety; and it is further ordered that RPF’s petitions for custody are hereby denied in their entirety with the exception of her request for attorneys’ fees, which shall be determined by this court upon written submission of the application; and it is further ordered that the paternity petition is hereby dismissed; and it is further ordered that the petition for a writ of habeas corpus is hereby dismissed as moot as the children have been returned to the State of New York; and it is further ordered that a short form order shall simultaneously issue herewith for presentation to any of the children’s health, education and welfare providers; and it is further ordered that any duly authorized police officer shall enforce this order.

 On December 6, 2016 this court communicated with Judge Stephen Walker of the 12th Judicial Circuit Court in the State of Florida pursuant to Domestic Relations Law § 76 et seq., as FG filed an ex parte application with the Florida court during the pendency of the instant trial.