OPINION OF THE COURT
Frank P. Ñervo, J.
Motion sequence No. 001 and No. 002 are consolidated for disposition in the following decision and order.
On September 1, 2016, petitioner moved for an order of joint custody with respondent of A (the child), the setting of a visitation schedule, and ancillary relief. A was born in Ethiopia; respondent adopted him in August 2011. (Motion sequence No. 1.)
On September 6, 2016, respondent moved to dismiss the petition and for sanctions. (Motion sequence No. 2.) In light of the fact that the parties participated in a hearing over the course of five months, the court will treat this motion as an answer to the petition.
This petition follows the August 30, 2016 decision of the Court of Appeals in Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d 1 [2016]). The Court in Brooke provides that, in pertinent part, “where a partner shows by clear and convincing evidence that the parties agreed to conceive a child and to raise the child together, the non-biological, non-adoptive partner has standing to seek visitation and custody under [New York State’s] Domestic Relations Law § 70.” (Id. at 14.)
The hearing started on September 8, 2016, and concluded on February 16, 2017. At the conclusion of the petitioner’s case on November 23, 2016, in an order dated January 5, 2017, the court denied respondent’s motion to dismiss the petition, determining petitioner had established a prima facie case allowing the matter to proceed. Respondent then proceeded with her defense to the petition.
Petitioner and respondent were in a relationship from 2007 to 2009, entering into a cohabitation agreement on May 18, 2007 (petitioner’s exhibit 1). It is undisputed that during their relationship, they entered into a plan to adopt and raise a child together. It is also undisputed that the parties’ relation *725 ship deteriorated over time and they entered into a separation agreement on May 28, 2010. (Petitioner’s exhibit 19.)
Respondent first learned that A was available for adoption in Ethiopia in March 2011, when she received his photograph and other information about him. She then began taking the necessary steps to complete the adoption.
Petitioner contends that her parenthood is established by her continued cooperation in the adoption process after the parties had separated. She contends that this cooperation included a $350,000 remittance to respondent as part of their separation agreement enabling respondent to establish a home sufficient to pass inspection by the adoption agency, her traveling with respondent and the child on a London-to-New York trip, and her involvement with the child’s medical care, educational and social activities after his arrival in New York. Petitioner concedes that her involvement with the child was limited because respondent would disapprove.
Respondent contends the plan to adopt dissolved contemporaneously with the dissolution of the parties’ relationship, and that petitioner’s involvement with the child after his adoption establishes only a supportive role as a close friend of the respondent and her child. She states that respondent was merely a godmother. Respondent also argues that at no time did she encourage, facilitate or condone a parental relationship between petitioner and her son.
The issue before the court is:
Has the petitioner met her burden of proof by clear and convincing evidence that the parties had a plan to adopt and raise a child together that continued unabated?
The court is mindful that Brooke does not include the words “continued unabated.” However, in the context of this case the standard must be an unabated plan. The court cannot take the position that once the parties discussed an adoption plan that plan continued without limit, despite the parties’ subsequent conduct and intent, an intent that terminated prior to the adoption, as demonstrated by the facts in the case.
Petitioner contends that once the parties entered into the adoption plan, it permanently gave her the same rights as a biological parent and, further, that after the child’s arrival in New York, respondent encouraged and condoned her involvement as a parent to A. The court rejects this because at the time of the adoption, the earlier agreement between the par *726 ties had already terminated as demonstrated by the conduct and words of respondent and the conduct and words of the petitioner, such as her statements that she did not want to be a mother, and her other statements that she considered respondent to be the sole adopting parent.
Respondent contends that any rights that the parties had once planned for petitioner ceased when the relationship terminated. She argues that she never encouraged, condoned, or recognized petitioner as a parent to her child.
Petitioner’s Evidence
Petitioner compensated respondent for her interest in the two properties the parties had previously owned jointly. There is no evidence that this was in furtherance of petitioner’s continued involvement in the adoption process. The separation agreement makes no mention of the adoption and unambiguously sets forth “[Petitioner] shall pay [respondent] a lump-sum payment in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00) (the ‘buy-out amount’) in consideration for [respondent’s] divestiture of her interest in 181 Sullivan and 128 Duryea.” (Petitioner’s exhibit 19, para 2.)
As to petitioner’s trip to New York from London with the respondent and the child, petitioner could not confirm respondent requested she meet them in London. In an email dated July 26, 2011, in addition to advising respondent of the mundane details of her personal and business schedule around the time of the trip, petitioner writes:
“If it happens that you’re travelling to get [A], I can either go all the way with you, or meet you in London and help you with the 2nd leg of the trip from London to NYC. I’m happy to do it, I’d love to actually, so let me know . . . Let me know your thoughts or if you need help on anything.” (Respondent’s K in evidence [emphasis supplied].)
On August 4, 2011, petitioner writes to respondent “I’d love to meet you in London and travel back with you if the timing works out” To which petitioner replies, “Yes if timing works out that could be amazing.” (Respondent’s exhibit IIIII in evidence [emphasis supplied].) These emails demonstrate only that this trip, in which the child is being brought to New York for the first time, is not one planned by two people adopting that child, but rather an arduous trip about which a friend offers to participate in to lend assistance.
*727 In attempting to demonstrate her involvement with the child’s medical care after he arrived in New York, petitioner relies on visits where she accompanied the child and the respondent, on two occasions to Tribeca Pediatrics and on one occasion to Dr. A. (Dr. A is the physician the parties jointly consulted when initially embarking on the adoption process.) However, the records of Tribeca Pediatrics note respondent as the child’s mother and refer to petitioner as only an emergency contact. While petitioner argues this note serves in some manner to establish her parenthood, the court disagrees, and finds this note serves only to establish petitioner as an emergency contact.
Petitioner asserts she toured elementary schools with respondent and that she enrolled the child in, and paid for, extracurricular activities, including soccer, tumbling, and African Dance. The court finds all such involvement, while demonstrative of love and support of respondent and her child, is so limited as to lend no weight to petitioner’s claim to parenthood.
Petitioner introduced into evidence many photographs of herself and the child engaged in various after-school and social activities. These photographs demonstrate nothing more than a doting attention to the child.
It is undisputed petitioner had taken the child on her own regularly to a restaurant that had a weekly children’s event. She also had him overnight at her home on a weekly, or almost weekly basis. It is significant that the petitioner concedes that the purpose of these overnight visits was an accommodation she gave respondent as a respite from her responsibilities as a single parent. This evidence also demonstrates, under these circumstances, the acts of a friend dear to both the child and his mother.
Petitioner relies, as well, on the respondent’s facilitation of the child’s access to her, and the respondent’s acknowledgment of their relationship. However, respondent reminds petitioner in an email dated May 18, 2015 that she is not a parent, and that respondent does not consider petitioner a parent:
‘You are the god parent of A, I am his adoptee [sic] parent. That role allows me to make decisions about him regarding his everyday world, his future as well as the communication between his birth family, his birth heritage and culture. You have a sacred connection with A he loves you for who you *728 are. Your bond is tight. It’s evident to the world how much he loves and cares for you. But I do find it hard when you try to infiltrate into our world without prior discussion. I don’t know when, or how god mum meant second mum. I included you as a close friend . . . But I honestly thought you had moved on, that we had separated and you were giving as [a] good friend, rather than as an expectation of being second parent.” (Petitioner’s exhibit 130 in evidence.)
The court finds that this demonstrates that respondent did not consider petitioner to be a parent.
Petitioner also argues a bond has developed between the child and her immediate family. Petitioner called as witnesses her parents, Mary and James G, and her sister, Jennifer G. All testified that they would visit with the child and respondent at their respective homes or the Fire Island home of petitioner, generally on holidays. Petitioner’s parents testified that although they considered themselves the child’s grandparents, they never introduced themselves as such to anyone in respondent’s presence. Petitioner’s mother testified, inconsistently, that she “never introduced (the child) to anyone,” and also that she introduced the child to her friend Carmen as “this is my grandson.” The court notes this inconsistency and finds that it not only diminishes the witness’ credibility, but also shows that third parties did not consider A as being petitioner’s adopted child.
Jennifer G testified that petitioner had referred to the child only as “my kid” when she introduced him to others, and only when outside the presence of respondent. The witness relayed the petitioner’s dissatisfaction with being titled godmother, and their joint acknowledgment that “in order to keep seeing A, we had to play along with (the title of godmother).” The court notes that there is no reference in any email to the witness as “aunt,” and no testimony or other evidence that the child referred to her at any time as “aunt,” or that respondent at any time suggested the witness be referred to as the child’s aunt.
Other, communications from petitioner’s family further rebut her contention that she is A’s parent.
In an email dated June 2, 2011, Jennifer G writes to respondent:
*729 “I hope you don’t mind, but K told me about A and I just wanted to send my congratulations! He looks absolutely amazing! Oh, he’s just so gorgeous and sweet. I am so happy for you! I know it’s a long, arduous process and that you have a lot to go through yet, but I’m wishing you the very best of luck! Please let me know if you need anything. I cannot wait to meet him—and I’m a great babysitter! Ha ha.” (Respondent’s exhibit QQQ in evidence.)
On September 10, 2011 the witness emailed respondent: “I just wanted to thank you again for having us to meet A! I’m so happy for you! He’s just a dream. Again, if you ever need a babysitter, don’t hesitate. Pete and I love kid-time—even if you needed an overnighter down the road.” (Respondent’s exhibit UUU in evidence.) At no time does the witness address or acknowledge petitioner as a mother or second parent to the child.
Petitioner’s father, Jim G, on January 26, 2013 emailed respondent:
“Hi C, just read the London Times article which brought me to tears. The tears are actually tears of joy because you and A found each other . . . Being with you and A at Christmas was very special for Mary and I [sic]. You allowed us to share with A and yourself the spirit of Christmas and family. I’m so happy to have a small part in this story because by your communications you allow us to share the progress as you and A become closer and closer to each other.
“C, the article spoke of your partner relationship ending. I’m very sorry for that because I cherish you as a daughter and a member of my family. Just want you to know that . . . The one sure thing is that I want to share in the life of A in my remaining years. Thank you so much for your bulletins, photos and updates which allow us to do just that. You’re not alone out there C, I’m an email or phone call away.” (Respondent’s exhibit MMM in evidence.)
It is remarkable at no time do these witnesses reference any happiness, pride, or other positive emotional effect upon the petitioner as a new mother, or to themselves as new grandparents or as a new aunt. Rather, they address themselves in such family terms only outside the presence of respondent and acknowledge their roles in this child’s life have been, and are, limited to “small parts” or as eager “babysitters.”
*730 Significantly, the record is devoid of proof that this child recognizes these witnesses as part of his family; indeed, he addresses all three only by their first names.
In addition to her immediate family members, petitioner called as a witness Jerry R, to whom she became acquainted through business in 1998. Petitioner and Jerry R became friends and went on vacation to Fire Island Pines, where he met respondent in 2006. In 2008, the witness had a conversation with petitioner in which she indicated “that (she and respondent) wanted to have a child together, and that they were looking toward adoption to do that.”
Throughout his testimony, the witness spoke of the undisputed loving relationship between petitioner and the child. On three occasions he heard the child refer to petitioner as “mom” to break his repetitively calling for her by the name he used, “Kee, Kee, Kee, Kee.” The court notes no other witness on behalf of either party testified hearing the child at any time refer to petitioner as “mom,” or similar nomenclature.
Jerry R testified that on November 8, 2010, he advised respondent in an email that petitioner told him that “C’s little black baby can swim in the Pines,” and “C’s little black baby can swim there just as good [sic] as in the Grove” as part of a “very sweet moment.” While the email is in evidence and speaks for itself, the witness testified that the term “black baby” may not have been used at the time of the reported conversation; however, he harbors no doubt that it was a reference to “C’s baby.” In spite of that confidence that the reference was to respondent’s child, the witness further attempted to modify the plain reading of the email, by testimony over six years later, that he now believes petitioner used the child’s actual name. If believed, this sudden realization would then serve to further modify the tenor of the email to the equivalent of “A can swim in the Pines,” without any reference to respondent whatsoever.
The court finds Jerry R’s attempts to modify by testimony that which was contemporaneously reported in writing in the email, as not credible. (Respondent’s exhibit NNN in evidence.)
Respondent’s Evidence
Respondent asserts that a significant factor in the parties’ separation was petitioner’s inability to commit to parenthood. Adding to her testimony, respondent cites a number of petitioner’s emails, including:
*731 December 8, 2009, “We have become a family over the last 6 years. I am not unraveling that here. I would be doing both of us a disservice and a kid, if I didn’t express my hesitation on (adoption). I knew it would make you sad, but it’s important to be clear in matters this serious.” (Respondent’s exhibit EEEEE [emphasis supplied].)
January 18, 2010, “Watching CNN. You could get yourself a Haitian orphan.” (Respondent’s exhibit LL in evidence [emphasis supplied].)
January 28, 2010, “I told my mom I was having some reservations about the adoption last week.” (Respondent’s exhibit EEE in evidence.)
April 21, 2010, petitioner wrote to respondent as part of a discussion of respondent’s anticipated future residence, “since you are the one getting a kid, would you consider staying at 181 (Sullivan Street) and have me move out? It’s only me and I don’t need much space . . . My needs are not as much as yours—you’re bringing a kid into the world? (Respondent’s exhibit FFFFF [emphasis supplied].)
A September 11, 2010 instant message was identified by witness Terri Sue P, former employee and business acquaintance of petitioner, in which petitioner notes: “But [respondent and I] don’t have a sexual connection and I don’t want to be a mother, two very big issues.” (Petitioner’s exhibit 21 in evidence.) Petitioner sought to dismiss this concession of not wanting to be a mother, as sarcasm. The court finds that this self-serving assertion is unconvincing. Terry Sue P also identified an email from petitioner reading, “I also had a dream and want to relocate the pool at Fire Island. I want it to be safe for C’s baby and [petitioner’s own] dog.” (Respondent’s exhibit JJJJ in evidence [emphasis supplied].)
On January 10, 2011, petitioner wrote to respondent that “I realize I’m a year too late, and this is your new year, new home, new partner, new life coming ... I know you’ve worked hard to get to this place. You deserve every happiness that’s showing up for you now.” (Respondent’s exhibit G in evidence.) This message does not assert any parental role by petitioner.
March 29, 2011, having been sent a photograph of the child, petitioner emailed respondent,
“I can’t stop looking at him. I am doing my best to temper my own emotional reaction to this, and want you to know I am so proud of you for following *732 your dream. You made this happen\ I saw his face, and a wave of grief rolled over me. He was supposed to be our son. I’m not sure I will ever get over my regret and sorrow over that. But I will be very, very happy for you and for him, and hope to find a way to be in your lives.” (Respondent’s exhibit 00 in evidence [emphasis supplied].)
This message is petitioner’s own acknowledgment that she is not a parent.
May 18, 2011, petitioner wrote to respondent,
“I am so happy for you. I want you to know I will be here to support you through this . . . emotionally, financially, etc. This is the culmination of a 3 V2-year journey, amazing. I am so melancholy that I’ve missed this opportunity in so many ways, but I will be here for you both however you need me.” (Respondent’s exhibit GGGGG [emphasis supplied].)
June 13, 2011, petitioner wrote to respondent who was in Ethiopia visiting the child, “I look forward to your updates and hope you feel good about your plans, about A, etcetera. Do you feel like he’s your guy?” (Respondent’s exhibit I in evidence [emphasis supplied].)
After the child’s arrival in New York, petitioner wrote to respondent on November 5, 2011, “You had faith that the right kid would come into your life, in the face of so many unknowns. You’re doing a killer job raising a vibrant kid. I admire you for all you’ve done, and are doing. How amazing you found each other.” (Respondent’s exhibit O in evidence [emphasis supplied].)
On May 20, 2015, petitioner emailed respondent, specifically acknowledging and defining her own role in the child’s life, “I am his godmother, that is family—I godparent him, nurture and love him.” Petitioner notes, further, her desire “to continue to provide support, financial and otherwise for any education, developmental, and recreational needs—sports, camp, speech therapy, etcetera.” Petitioner unequivocally acknowledges her lack of parental or other legal status in the child’s life in asking that respondent
“be open to a future discussion of (herself) as legal guardian in the event of something happening to C with a contingency that ensures C’s family be a major factor in his life ... I want to explore assur- *733 anees of my continued role, access, primacy, etcet-era; particularly if moving back to the UK becomes a reality. . . Despite my own sadness and regret over not being one of A’s adoptive parents, I long ago made peace with my role as godmother. I have never inferred or articulated to A, or to anyone that I am his mother. For the record, I respect and honor your role as mom.” (Respondent’s exhibit HH in evidence [emphasis supplied].)
These emails all demonstrate petitioner’s own acknowledgment that she is not A’s parent. Rather, the clear and convincing evidence is that before A was identified for adoption as well as after the adoption by respondent was finalized, petitioner herself acknowledged repeatedly that the plan to adopt a child with respondent died with their relationship and that she had no parental role in A’s life.
The child has resided at all times in New York with his adoptive mother, the respondent. As previously noted, while the child did spend time at petitioner’s home on Sullivan Street, frequently overnight in the sole care of petitioner, and there were a number of overnight visits to the petitioner’s Fire Island summer home with the respondent present, petitioner was merely denoted by respondent as her child’s godmother. Petitioner testified she acquiesced in this title precisely because respondent objected to any recognition of her as a co-parent. The record contains no proof that petitioner’s relationship to A was anything more than this informal characterization.
Other respondent witnesses further demonstrate that petitioner was never considered a parent, either by herself or others. Respondent called as witnesses a number of people with personal or professional involvement with the petitioner, the respondent and the respondent’s child. These included:
Alexis B, an acknowledged good friend of both parties, testified that she spoke with both about adoption “fairly frequently,” and in a “sustained way” with petitioner. In the fall of 2009, before the parties’ separation, during a conversation with both at petitioner’s home on Sullivan Street, in response to comments about her research of the possible difficulties presented by adopted children, respondent expressed that “this worried her greatly and that you didn’t know what you were going to get.” Petitioner also expressed that at that point in her life her dogs and her work were enough responsibility, and she “couldn’t take on any more responsibility” and “did not want to have that responsibility.”
*734 Alexis B continued to maintain regular contact with both parties after their breakup in December 2009. In April 2010, respondent stayed at the witness’ apartment. At no time after the parties’ breakup did respondent indicate that petitioner would be co-parenting any adopted child; at no time did petitioner indicate to the witness that she was continuing to be involved in the adoption process; at no time after the arrival of the child did petitioner present herself to this witness as his parent. On the many occasions the witness saw the child, she “never heard him talk about [petitioner].”
Beth J, a former client and former employee of petitioner’s business, has maintained a close friendship with petitioner. She is familiar with “every personal detail” of petitioner’s life. Beth J testified that prior to the parties’ breakup, petitioner “made it very clear that she didn’t want children” and “that she wasn’t sure if she really wanted to go through [with the adoption], as she was still interested in her ex-girlfriend at the time.” Further, after the parties had separated in 2009, petitioner advised the witness that “C was following through with the adoption on her own.” After the child’s arrival, petitioner advised Beth J that she “was happy for” respondent, and at no time did petitioner describe the child to the witness as her son.
Patricia B, a special education teacher, developed an individual education program for the benefit of A. The program was developed with input from the child’s classroom teacher, other professional educators, and the respondent. At no time did either party advise Patricia B that petitioner was a parent. In fact, the first time Patricia B learned of petitioner’s existence was upon being subpoenaed to testify.
Michele F, the parent coordinator at P.S. 41, testified that respondent is the only person noted as A’s parent on the school’s record, known as a blue card; nor was there any indication that petitioner had been registered at any time on the school’s website for access to information about a student’s schedule or activities at the school.
Joni A, the education director at the Chelsea Piers Kids Early Learning Center and Preschool that A attended since July 2012, testified that at no time did the Center know petitioner as A’s parent; she was not listed on any of the school records as a parent.
Each of the following witnesses testified that at no time was petitioner introduced, or otherwise identified to them, as A’s mother or co-parent:
*735 Jane M, a journalist and friend of the parties;
Camille S, who recommended Chelsea Piers (CP) Kids to respondent;
Holly F, a former coworker of respondents, and babysitter of A;
Atefah C, who, along with her own adopted son, had very nearly weekly contact with the respondent and A, and in two brief contacts was introduced to petitioner as respondent’s ex-partner and godmother to A;
Dawn S, whose daughter was enrolled in a dance class with A, testified that petitioner identified herself as his godmother, and stated that “his mom had adopted him from Ethiopia”;
Lars M, the proprietor of the swimming school A attended;
Susan K, audiologist at the Department of Education who tested A’s hearing;
Michael G, next door neighbor to respondent and A;
Adam H, a parent with a child in attendance at CP Kids, who participated in day trips and coordinated sleepovers with the children at each other’s homes;
Daniel B, current acquaintance of both parties whom he knew before their breakup, and who provided a letter in support of the respondent’s adoption of the child (respondent’s exhibit RRRR in evidence);
Kathrin S-T, who worked with both parties, and attended a baby shower at respondent’s home, hosted by petitioner and in the company of others, but at which only respondent was given gifts and congratulated. This testimony indicates that the third parties who attended the shower recognized respondent as sole parent.
Joseph G, whose child is A’s age, and has hosted children’s birthday parties at his home and was familiar with respondent and A through their attendance at CP Kids Preschool and PS. 41.
The court was constrained to limit respondent’s further witnesses, as their testimony would have been cumulative.
Upon the presentation of the evidence of both parties over 36 days of testimony, constituting a hearing transcript of 4,738 pages, 215 exhibits on behalf of petitioner and 126 exhibits on behalf of respondent, the court finds the petitioner has on numerous occasions stated that she did not want to be a parent and gave no indication to either respondent or third parties *736 that she either wanted this role or acted as a parent. Therefore, she has failed to establish by clear and convincing evidence that she has standing as a parent under Domestic Relations Law § 70, as established in Matter of Brooke S.B. v Elizabeth A.C.C.
Accordingly, it is ordered that the respondent’s motion to dismiss the petition is granted without costs or sanctions; and it is further adjudged that the petition is denied; and the proceeding dismissed; and it is further ordered that all interim orders of Justice Matthew F. Cooper issued September 1, 2016 are vacated; and it is further ordered that all interim orders of this court are vacated; and it is further ordered that all provisions of this order are stayed for a period of 20 days from the date of this order.