OPINION OF THE COURT
Abdtjs-Salaam, J.
These two cases call upon us to assess the continued vitality of the rule promulgated in Matter of Alison D. v Virginia M. (77 NY2d 651 [1991])—namely that, in an unmarried couple, a partner without a biological or adoptive relation to a child is not that child’s “parent” for purposes of standing to seek custody or visitation under Domestic Relations Law § 70 (a), notwithstanding their “established relationship with the child” *14 (77 NY2d at 655). Petitioners in these cases, who similarly lack any biological or adoptive connection to the subject children, argue that they should have standing to seek custody and visitation pursuant to Domestic Relations Law § 70 (a). We agree that, in light of more recently delineated legal principles, the definition .of “parent” established by this Court 25 years ago in Alison D. has become unworkable when applied to increasingly varied familial relationships. Accordingly, today, we overrule Alison D. and hold that where a partner shows by clear and convincing evidence that the parties agreed to conceive a child and to raise the child together, the non-biological, non-adoptive partner has standing to seek visitation and custody under Domestic Relations Law § 70.
L

Matter of Brooke S.B. v Elizabeth A.C.C.

Petitioner and respondent entered into a relationship in 2006 and, one year later, announced their engagement.[1] At the time, however, this was a purely symbolic gesture; same-sex couples could not legally marry in New York. Petitioner and respondent lacked the resources to travel to another jurisdiction to enter into a legal arrangement comparable to marriage, and it was then unclear whether New York would recognize an out-of-state same-sex union.
Shortly thereafter, the couple jointly decided to have a child and agreed that respondent would carry the child. In 2008, respondent became pregnant through artificial insemination. During respondent’s pregnancy, petitioner regularly attended prenatal doctor’s appointments, remained involved in respondent’s care, and joined respondent in the emergency room when she had a complication during the pregnancy. Respondent went into labor in June 2009. Petitioner stayed by her side and, when the subject child, a baby boy, was born, petitioner cut the umbilical cord. The couple gave the child petitioner’s last name.
The parties continued to live together with the child and raised him jointly, sharing in all major parental responsibilities. Petitioner stayed at home with the child for a year while respondent returned to work. The child referred to petitioner as “Mama B.”
*15 In 2010, the parties ended their relationship. Initially, respondent permitted petitioner regular visits with the child. In late 2012, however, petitioner’s relationship with respondent deteriorated and, in or about July 2013, respondent effectively terminated petitioner’s contact with the child.
Subsequently, petitioner commenced this proceeding seeking joint custody of the child and regular visitation. Family Court appointed an attorney for the child. That attorney determined that the child’s best interests would be served by allowing regular visitation with petitioner.
Respondent moved to dismiss the petition, asserting that petitioner lacked standing to seek visitation or custody under Domestic Relations Law § 70 as interpreted in Alison D. because, in the absence of a biological or adoptive connection to the child, petitioner was not a “parent” within the meaning of the statute. Petitioner and the attorney for the child opposed the motion, contending that, in light of the legislature’s enactment of the Marriage Equality Act (see L 2011, ch 95; Domestic Relations Law § 10-a) and other changes in the law, Alison D. should no longer be followed. They further argued that petitioner’s long-standing parental relationship with the child conferred standing to seek custody and visitation under principles of equitable estoppel.
After hearing argument on the motion, Family Court dismissed the petition. While commenting on the “heartbreaking” nature of the case, Family Court noted that petitioner did not adopt the child and therefore granted respondent’s motion to dismiss on constraint of Alison D. The attorney for the child appealed.[2]
The Appellate Division unanimously affirmed (see 129 AD3d 1578, 1578-1579 [4th Dept 2015]). The Court concluded that, because petitioner had not married respondent, had not adopted the child, and had no biological relationship to the child, Alison D. prohibited Family Court from ruling that petitioner had standing to seek custody or visitation (see id. at 1579). We granted the attorney for the child leave to appeal (see 26 NY3d 901 [2015]).

Matter of Estrellita A. v Jennifer L.D.

Petitioner and respondent entered into a relationship in 2003 and moved in together later that year. In 2007, petitioner and *16 respondent registered as domestic partners, and thereafter, they agreed to have a child. The couple jointly decided that respondent would bear the child and that the donor should share petitioner’s ethnicity. In February 2008, respondent became pregnant through artificial insemination. During the pregnancy, petitioner attended medical appointments with respondent. In November 2008, respondent gave birth to a baby girl. Petitioner cut the umbilical cord. The couple agreed that the child should call respondent “Mommy” and petitioner “Mama.”
The child resided with the couple in their home and, over the next three years, the parties shared a complete range of parental responsibilities. However, in May 2012, petitioner and respondent ended their relationship, and petitioner moved out in September 2012. Afterward, petitioner continued to have contact with the child.
In October 2012, respondent commenced a proceeding in Family Court seeking child support from petitioner. Petitioner denied liability. While the support case was pending, petitioner filed a petition in Family Court that, as later amended, sought visitation with the child. The court appointed an attorney for the child.
After a hearing, Family Court granted respondent’s child support petition and remanded the matter to a support magistrate to determine petitioner’s support obligation. The court held that “the uncontroverted facts establish [ed] ” that petitioner was “a parent” to the child and, as such, “chargeable with the support of the child.” Petitioner then amended her visitation petition to indicate that she “ha[d] been adjudicated the parent” of the child and therefore was a legal parent for visitation purposes.
Thereafter, respondent moved to dismiss the visitation petition on the ground that petitioner did not have standing to seek custody or visitation under Domestic Relations Law § 70 as interpreted in Alison D. The attorney for the child supported visitation and opposed respondent’s motion to dismiss. Petitioner also opposed respondent’s motion to dismiss, asserting that Alison D. and our decision in Debra H. v Janice R. (14 NY3d 576 [2010]) did not foreclose a finding of standing based on judicial estoppel, as the prior judgment in the support proceeding determined that petitioner was a legal parent to the subject child. Respondent contended that the prerequisites for judicial estoppel had not been met.
*17 Family Court denied respondent’s motion to dismiss the visitation petition (see 40 Misc 3d 219, 219-225 [Fam Ct, Suffolk County 2013]). Citing Alison D. and Debra H., the court acknowledged that petitioner did not have standing to petition for visitation based on equitable estoppel or her general status as a de facto parent (see id. at 225). However, given respondent’s successful support petition, the court concluded that the doctrine of judicial estoppel conferred standing on petitioner to request visitation with the child (see id. at 225). The court distinguished Alison D. and Debra H., reasoning that, in those cases, the Court “did not address the situation . . . where one party has asserted inconsistent positions” (id.). Here, in light of respondent’s initial claim that petitioner was the child’s legal parent in the support proceeding, the court “ma[de] a finding that respondent [wa]s judicially estopped from asserting that petitioner [wa]s not a parent based upon her sworn petition and testimony in a prior court proceeding where she took a different position because her interest in that case was different” (id.). Respondent filed an interlocutory appeal, which was dismissed by the Appellate Division.
Subsequently, Family Court held a hearing on the petition. The court found that petitioner’s regular visitation and consultation on matters of import with respect to the child would serve the child’s best interests. Respondent appealed.
Family Court’s order was unanimously affirmed (see 123 AD3d 1023, 1023-1027 [2d Dept 2014]). The Appellate Division determined that, while Domestic Relations Law § 70, as interpreted in Alison D., confers standing to seek custody or visitation only on a biological or adoptive parent, Alison D. does not preclude recognition of standing based upon the doctrine of judicial estoppel. Under that doctrine, the Court found, “a party who assumes a certain position in a prior legal proceeding and secures a favorable judgment therein is precluded from assuming a contrary position in another action simply because his or her interests have changed” (id. at 1026 [internal quotation marks and citations omitted]). The Appellate Division agreed with Family Court that the requirements of judicial estoppel had been met: respondent’s position in the support proceeding was inconsistent with her position in the visitation proceeding; respondent had won a favorable judgment based on her earlier position; and allowing respondent to maintain an inconsistent position in the visitation proceeding would prejudice petitioner (see id. at 1026). Accordingly, the *18 Appellate Division concluded that respondent was judicially-estopped from denying petitioner’s standing as a “parent” of the child within the meaning of Domestic Relations Law § 70 (see id. at 1026-1027). We granted respondent leave to appeal (see 26 NY3d 901 [2015]).
IL
Domestic Relations Law § 70 provides:
“Where a minor child is residing within this state, either parent may apply to the supreme court for a writ of habeas corpus to have such minor child brought before such court; and on the return thereof, the court, on due consideration, may award the natural guardianship, charge and custody of such child to either parent for such time, under such regulations and restrictions, and with such provisions and directions, as the case may require, and may at any time thereafter vacate or modify such order. In all cases there shall be no prima facie right to the custody of the child in either parent, but the court shall determine solely what is for the best interest of the child, and what will best promote its welfare and happiness, and make award accordingly” (Domestic Relations Law § 70 [a] [emphases added]).
Only a “parent” may petition for custody or visitation under Domestic Relations Law § 70, yet the statute does not define that critical term, leaving it to be defined by the courts.[3]
In Alison D. (77 NY2d 651), we supplied a definition. In that case, Alison D. and Virginia M. were in a long-term relationship and decided to have a child (see Alison D., 77 NY2d at 655). They agreed that Virginia M. would carry the baby and that they would jointly raise the child, sharing parenting responsibilities (see id.). After the child was born, Alison D. acted as a parent in all major respects, providing financial, emotional and practical support (see id.). Even after the couple ended their relationship and moved out of their shared home, Alison D. continued to regularly visit the child until he was about six years old, at which point Virginia M. terminated contact between them (see id.).
*19 Alison D. petitioned for visitation pursuant to Domestic Relations Law § 70 (see id. at 656). In support of the petition, Alison D. argued that, although Virginia M. was concededly a fit parent, Alison D. nonetheless had standing to seek visitation with the child (see id.). The lower courts dismissed Alison D.’s petition for lack of standing, ruling that only a biological parent— and not a de facto parent—is a legal “parent” with standing to seek visitation under Domestic Relations Law § 70 (see id.; see also Matter of Alison D. v Virginia M., 155 AD2d 11, 13-16 [2d Dept 1990]).
We affirmed the lower courts’ dismissal of Alison D.’s petition for lack of standing (see Alison D., 77 NY2d at 655, 657). We decided that the word “parent” in Domestic Relations Law § 70 should be interpreted to preclude standing for a de facto parent who, under a theory of equitable estoppel, might otherwise be recognized as the child’s parent for visitation purposes (see id. at 656-657). Specifically, we held that “a biological stranger to a child who is properly in the custody of his biological mother” has no “standing to seek visitation with the child under Domestic Relations Law § 70” (id. at 654-655).
We rested our determination principally on the need to preserve the rights of biological parents (see id. at 656-657). Specifically, we reasoned that, “traditionally, in this State it is the child’s mother and father who, assuming fitness, have the right to the care and custody of their child” (id. at 656). We therefore determined that the statute should not be read to permit a de facto parent to seek visitation of a child in a manner that “would necessarily impair the parents’ right to custody and control” (id. at 656-657).
Additionally, we suggested that, because the legislature expressly allowed certain non-parents—namely, grandparents and siblings—to seek custody or visitation (see Domestic Relations Law §§ 71-72), it must have intended to exclude de facto parents or parents by estoppel (see Alison D., 77 NY2d at 657). And so, because Alison D. had no biological or adoptive connection to the subject child, she had no standing to seek visitation and “no right to petition the court to displace the choice made by this fit parent in deciding what is in the child’s best interests” (id.).
Judge Kaye dissented on the ground that a person who “stands in loco parentis” should have standing to seek visitation under Domestic Relations Law § 70 (see id. at 657-662 *20 [Kaye, J., dissenting]). Observing that the Court’s decision would “fall[ ] hardest” on the millions of children raised in nontraditional families—including families headed by same-sex couples, unmarried opposite-sex couples, and stepparents— the dissent argued that the majority had “turn[ed] its back on a tradition of reading section 70 so as to promote the welfare of the children” (id. at 658-660). The dissent asserted that, because Domestic Relations Law § 70 did not define “parent”— and because the statute made express reference to the “best interest of the child”—the Court was free to craft a definition that accommodated the welfare of the child {id.). According to the dissent, well-established principles of equity—namely, “Supreme Court’s equitable powers that complement” Domestic Relations Law § 70—supplied jurisdiction to act out of “concern for the welfare of the child” (id. at 660; see Matter of Bachman v Mejias, 1 NY2d 575, 581 [1956]; Finlay v Finlay, 240 NY 429, 433-434 [1925]; Langerman v Langerman, 303 NY 465, 471 [1952]).
At the same time, Judge Kaye in her dissent recognized that
“there must be some limitation on who can petition for visitation. Domestic Relations Law § 70 specifies that the person must be the child’s ‘parent,’ and the law additionally recognizes certain rights of biological and legal parents. . . .
“It should be required that the relationship with the child came into being with the consent of the biological or legal parent” (Alison D., 77 NY2d at 661-662 [Kaye, J., dissenting] [citations omitted]).
The dissent also noted that a properly constituted test should likely include other factors as well, to ensure that all relevant interests are protected (see id. at 661-662 [Kaye, J., dissenting]). Judge Kaye further stated in the dissent that she would have remanded Alison D. so that the lower court could engage in a two-part inquiry: first, to determine whether Alison D. stood “in loco parentis” under whatever test the Court devised; and then, “if so, whether it is in the child’s best interest to allow her the visitation rights she claims” (id. at 662).
In 1991, same-sex partners could not marry in this state. Nor could a biological parent’s unmarried partner adopt the child. As a result, a partner in a same-sex relationship not biologically related to a child was entirely precluded from obtaining standing to seek custody or visitation of that child under our definition of “parent” supplied in Alison D.
*21 Four years later, in Matter of Jacob (86 NY2d 651 [1995]), we had occasion to decide whether “the unmarried partner of a child’s biological mother, whether heterosexual or homosexual, who is raising the child together with the biological parent, can become the child’s second parent by means of adoption” (id. at 656). We held that the adoptions sought in Matter of Jacob— “one by an unmarried heterosexual couple, the other by the lesbian partner of the child’s mother”—were “fully consistent with the adoption statute” {id.). We reasoned that, while the adoption statute “must be strictly construed,” our “primary loyalty must be to the statute’s legislative purpose—the child’s best interest” (id. at 657-658). The outcome in Matter of Jacob was to confer standing to seek custody or visitation upon unmarried, non-biological partners—including a partner in a same-sex relationship—who adopted the child, even under our restrictive definition of “parent” set forth in Alison D. (id. at 659).
Thereafter, in Matter of Shondel J. v Mark D. (7 NY3d 320 [2006]), we applied a similar analysis, holding that a “man who has mistakenly represented himself as a child’s father may be estopped from denying paternity, and made to pay child support, when the child justifiably relied on the man’s representation of paternity, to the child’s detriment” (id. at 324). We based our decision on “the best interests of the child,” emphasizing “[t]he potential damage to a child’s psyche caused by suddenly ending established parental support” (id. at 324, 330).[4]
Despite these intervening decisions that sought a means to take into account the best interests of the child in adoption and support proceedings, we declined to revisit Alison D. when confronted with a nearly identical situation almost 20 years later. Debra H., as did Alison D., involved an unmarried same-sex couple. Petitioner alleged that they agreed to have a child, and to that end, Janice R. was artificially inseminated and bore the child. Debra H. never adopted the child. After the couple ended their relationship, Debra H. petitioned for custody and visitation (Debra H., 14 NY3d at 586-588). We declined to expand the definition of “parent” for purposes of Domestic Rela *22 tions Law § 70, noting that “Alison D., in conjunction with second-parent adoption, creates a bright-line rule that promotes certainty in the wake of domestic breakups” (id. at 593).
Nonetheless, in Debra H., we arrived at a different result than in Alison D. Ultimately, we invoked the common-law doctrine of comity to rule that, because the couple had entered into a civil union in Vermont prior to the child’s birth—and because the union afforded Debra H. parental status under Vermont law—her parental status should be recognized under New York law as well (see id. at 598-601). Seeing no obstacle in New York’s public policy or comity doctrine to the recognition of the non-biological mother’s standing, we declared that “New York will recognize parentage created by a civil union in Vermont,” thereby granting standing to Debra H. to petition for custody and visitation of the subject child (id. at 600-601).
In a separate discussion, we also “reaffirm [ed] our holding in Alison D.” (id. at 589). We acknowledged the apparent tension in our decision to authorize parentage by estoppel in the support context (see Shondel J., 7 NY3d 320) and yet deny it in the visitation and custody context (see Alison D., 77 NY2d 651), but we decided that this incongruity did not fatally undermine Alison D. (see Debra H., 14 NY3d at 592-593).
Chief Judge Lippman and Judge Ciparick concurred in the result, agreeing with the majority’s comity analysis but asserting that Alison D. should be overruled (see id. at 606-609 [Ciparick, J., concurring]). This concurrence asserted that Alison D. had indeed caused the widespread harm to children predicted by Judge Kaye’s dissent (see id. at 606-607). Noting the inconsistency between Alison D. and the Court’s ruling in Shondel J., the concurrence concluded that “[sjupport obligations flow from parental rights; the duty to support and the rights of parentage go hand in hand and it is nonsensical to treat the two things as severable” (id. at 607). According to the concurrence, Supreme Court had “inherent equity powers and authority pursuant to Domestic Relations Law § 70 to determine who is a parent and what will serve the child’s best interests” (id. at 609). Echoing the dissent in Alison D., and “taking into consideration the social changes” that occurred since that decision, the concurrence called for a “flexible, multi-factored” approach to determine whether a parental relationship had been established (id. at 608).
A separate concurrence by Judge Smith in that case acknowledged the same social changes and proposed that, in the inter *23 est of insuring that “each child begins life with two parents,” an appropriate test would focus on whether “a child is conceived through [artificial insemination] by one member of a same-sex couple living together, with the knowledge and consent of the other” (id. at 611-612). Judge Smith observed that “[e]ach of these couples made a commitment to bring a child into a two-parent family, and it is unfair to the children to let the commitment go unenforced” {id. at 611).
HH HH HH
We must now decide whether, as respondents claim, the doctrine of stare decisis warrants retention of the rule established in Alison D. Under stare decisis, a court’s decision on an issue of law should generally bind the court in future cases that present the same issue (see People v Rodriguez, 25 NY3d 238, 243 [2015]; People v Taylor, 9 NY3d 129, 148-149 [2007]). The doctrine “promotes predictability in the law, engenders reliance on our decisions, encourages judicial restraint and reassures the public that our decisions arise from a continuum of legal principle rather than the personal caprice of the members of this Court” (People v Peque, 22 NY3d 168, 194 [2013]). But in the rarest of cases, we may overrule a prior decision if an extraordinary combination of factors undermines the reasoning and practical viability of our prior decision (see People v Rudolph, 21 NY3d 497, 500-503 [2013]; see id. at 505-507 [Graffeo, J., concurring]; People v Reome, 15 NY3d 188, 191-195 [2010]; People v Feingold, 7 NY3d 288, 291-296 [2006]).
Long before our decision in Alison D., New York courts invoked their equitable powers to ensure that matters of custody, visitation and support were resolved in a manner that served the best interests of the child (see Finlay, 240 NY at 433; Wilcox v Wilcox, 14 NY 575, 578-579 [1856]; see generally Guardian Loan Co. v Early, 47 NY2d 515, 520 [1979]; People ex rel. Lemon v Supreme Ct. of State of N.Y., 245 NY 24, 28 [1927]; De Coppet v Cone, 199 NY 56, 63 [1910]). Consistent with these broad equitable powers, our courts have historically exercised their “inherent equity powers and authority” in order to determine “who is a parent and what will serve a child’s best interests” (Debra H., 14 NY3d at 609 [Ciparick, J., concurring]; see also NY Const, art VI, § 7 [a]).
Domestic Relations Law § 70 evolved in harmony with these equitable practices. The statute expanded in scope from a law narrowly conferring standing in custody and visitation matters *24 upon a legally separated, resident “husband and wife” pair (L 1909, ch 19) to a broader measure granting standing to “either parent” without regard to separation (L 1964, ch 564). The legislature made many of these changes to conform to the courts’ preexisting equitable practices (see L 1964, ch 564, § 1; Mem of Joint Legis Comm on Matrimonial and Family Laws, Bill Jacket, L 1964, ch 564 at 6). Tellingly, the statute has never mentioned, much less purported to limit, the court’s equitable powers, and even after its original enactment, courts continued to employ principles of equity to grant custody, visitation or related extra-statutory relief (see People ex rel. Meredith v Meredith, 272 App Div 79, 82-90 [2d Dept 1947], affd 297 NY 692 [1947]; Matter of Rich v Kaminsky, 254 App Div 6, 7-9 [1st Dept 1938]; cf. Langerman, 303 NY at 471-472; Finlay, 240 NY at 430-434).
Departing from this tradition of invoking equity, in Alison D., we narrowly defined the term “parent,” thereby foreclosing “all inquiry into the child’s best interest” in custody and visitation cases involving parental figures who lacked biological or adoptive ties to the child (Alison D., 77 NY2d at 659 [Kaye, J., dissenting]). And, in the years that followed, lower courts applying Alison D. were “forced to . . . permanently sever strongly formed bonds between children and adults with whom they have parental relationships” (Debra H., 14 NY3d at 606 [Ciparick, J., concurring]). By “limiting their opportunity to maintain bonds that may be crucial to their development,” the rule of Alison D. has “fall[en] hardest on the children” (Alison D., 77 NY2d at 658 [Kaye, J., dissenting]).
As a result, in the 25 years since Alison D. was decided, this Court has gone to great lengths to escape the inequitable results dictated by a needlessly narrow interpretation of the term “parent.” Now, we find ourselves in a legal landscape wherein a non-biological, non-adoptive “parent” may be estopped from disclaiming parentage and made to pay child support in a filiation proceeding (Shondel J., 7 NY3d 320), yet denied standing to seek custody or visitation (Alison D., 77 NY2d at 655). By creating a disparity in the support and custody contexts, Alison D. has created an inconsistency in the rights and obligations attendant to parenthood. Moreover, Alison D.’s foundational premise of heterosexual parenting and nonrecognition of same-sex couples is unsustainable, particularly in light of the enactment of same-sex marriage in New York State, and the United States Supreme Court’s holding in *25 Obergefell v Hodges (576 US —, 135 S Ct 2584 [2015]), which noted that the right to marry provides benefits not only for same-sex couples, but also the children being raised by those couples.
Under the current legal framework, which emphasizes biology, it is impossible—without marriage or adoption—for both former partners of a same-sex couple to have standing, as only one can be biologically related to the child (see Alison D., 77 NY2d at 656). By contrast, where both partners in a heterosexual couple are biologically related to the child, both former partners will have standing regardless of marriage or adoption. It is this context that informs the Court’s determination of a proper test for standing that ensures equality for same-sex parents and provides the opportunity for their children to have the love and support of two committed parents.
The Supreme Court has emphasized the stigma suffered by the “hundreds of thousands of children [who] are presently being raised by [same-sex] couples” (Obergefell, 576 US at —, 135 S Ct at 2600-2601). By “fixing biology as the key to visitation rights” (Alison D., 77 NY2d at 657-658 [Kaye, J., dissenting]), the rule of Alison D. has inflicted disproportionate hardship on the growing number of nontraditional families across our state. At the time Alison D. was decided, estimates suggested that “more than 15.5 million children [did] not live with two biological parents, and that as many as 8 to 10 million children are born into families with a gay or lesbian parent” (id.). Demographic changes in the past 25 years have further transformed the elusive concept of the “average American family” (Troxel v Granville, 530 US 57, 63-64 [2000]); recent census statistics reflect the large number of same-sex couples residing in New York, and that many of New York’s same-sex couples are raising children who are related to only one partner by birth or adoption (see Gary J. Gates & Abigail M. Cooke, The Williams Institute, New York Census Snapshot: 2010 at 1-3).
Relatedly, legal commentators have taken issue with Alison D. for its negative impact on children. A growing body of social science reveals the trauma children suffer as a result of separation from a primary attachment figure—such as a de facto parent—regardless of that figure’s biological or adoptive ties to the children (see Amanda Barfield, Note, The Intersection of Same-Sex and Stepparent Visitation, 23 JL & Pol’y 257, 259-260 [2014]; Ayelet Blecher-Prigat, Rethinking Visitation: From a Parental to a Relational Right, 16 Duke J Gender L & Pol’y 1, *26 7 [2009]; Suzanne B. Goldberg, Family Law Cases as Law Reform Litigation: Unrecognized Parents and the Story of Alison D. v Virginia M., 17 Colum J Gender & L 307 [2008]; Mary Ellen Gill, Note, Third Party Visitation in New York: Why the Current Standing Statute Is Failing Our Families, 56 Syracuse L Rev 481, 488-489 [2006]; Joseph G. Arsenault, Comment, “Family” but not “Parent”: The Same-Sex Coupling Jurisprudence of the New York Court of Appeals, 58 Alb L Rev 813, 834, 836 [1995]; see also brief for National Association of Social Workers as amicus curiae at 13-17 [collecting articles]).
We must, however, protect the substantial and fundamental right of biological or adoptive parents to control the upbringing of their children (see Alison D., 77 NY2d at 656-657; Troxel v Granville, 530 US 57, 65 [2000]). For certainly, “the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests,” and any infringement on that right “comes with an obvious cost” (Troxel, 530 US at 64-65). But here we do not consider whether to allow a third party to contest or infringe on those rights; rather, the issue is who qualifies as a “parent” with coequal rights. Nevertheless, the fundamental nature of those rights mandates caution in expanding the definition of that term and makes the element of consent of the biological or adoptive parent critical.
While “parents and families have fundamental liberty interests in preserving” intimate family-like bonds, “so, too, do children have these interests” (Troxel, 530 US at 88-89 [Stevens, J., dissenting]), which must also inform the definition of “parent,” a term so central to the life of a child. The “bright-line” rule of Alison D. promotes the laudable goals of certainty and predictability in the wake of domestic disruption (Debra H., 14 NY3d at 593-594). But bright lines cast a harsh light on any injustice and, as predicted by Judge Kaye, there is little doubt by whom that injustice has been most finely felt and most finely perceived (see Alison D., 77 NY2d at 658 [Kaye, J., dissenting]). We will no longer engage in the “deft legal maneuvering” necessary to read fairness into an overly-restrictive definition of “parent” that sets too high a bar for reaching a child’s best interest and does not take into account equitable principles (see Debra H., 14 NY3d at 606-608 [Cipar-ick, J., concurring]). Accordingly, we overrule Alison D.
*27 IV.
Our holding that Domestic Relations Law § 70 permits a non-biological, non-adoptive parent to achieve standing to petition for custody and visitation requires us to specify the limited circumstances in which such a person has standing as a “parent” under Domestic Relations Law § 70 (see Alison D., 77 NY2d at 661 [Kaye, J., dissenting]; Troxel, 530 US at 67). Because of the fundamental rights to which biological and adoptive parents are undeniably entitled, any encroachment on the rights of such parents and, especially, any test to expand who is a parent, must be, as Judge Kaye acknowledged in her dissent in Alison D., appropriately narrow.
Petitioners and some of the amici urge that we endorse a functional test for standing, which has been employed in other jurisdictions that recognize parentage by estoppel in the custody and/or visitation context (see In re Custody of H.S.H-K., 193 Wis 2d 649, 694-695, 533 NW2d 419, 435-436 [1995] [visitation only]; see also Conover v Conover, 448 Md 548, 576-577, 141 A3d 31, 47-48 [2016] [collecting cases from other jurisdictions that have adopted the functional test in contexts of custody or visitation]). The functional test considers a variety of factors, many of which relate to the post-birth relationship between the putative parent and the child. Amicus Sanctuary for Families proposes a different test that hinges on whether petitioner can prove, by clear and convincing evidence, that a couple “jointly planned and explicitly agreed to the conception of a child with the intention of raising the child as co-parents” (brief for Sanctuary for Families as amicus curiae at 39).
Although the parties and amici disagree as to what test should be applied, they generally urge us to adopt a test that will apply in determining standing as a parent for all non-biological, non-adoptive, non-marital “parents” who are raising children. We reject the premise that we must now declare that one test would be appropriate for all situations, or that the proffered tests are the only options that should be considered.
Petitioners in the two cases before us have alleged that the parties entered into a pre-conception agreement to conceive and raise a child as co-parents. We hold that these allegations, if proved by clear and convincing evidence, are sufficient to establish standing. Because we necessarily decide these cases based on the facts presented to us, it would be premature for us to consider adopting a test for situations in which a couple *28 did not enter into a pre-conception agreement. Accordingly, we do not now decide whether, in a case where a biological or adoptive parent consented to the creation of a parent-like relationship between his or her partner and child after conception, the partner can establish standing to seek visitation and custody.
Inasmuch as the conception test applies here, we do not opine on the proper test, if any, to be applied in situations in which a couple has not entered into a pre-conception agreement. We simply conclude that, where a petitioner proves by clear and convincing evidence that he or she has agreed with the biological parent of the child to conceive and raise the child as co-parents, the petitioner has presented sufficient evidence to achieve standing to seek custody and visitation of the child. Whether a partner without such an agreement can establish standing and, if so, what factors a petitioner must establish to achieve standing based on equitable estoppel are matters left for another day, upon a different record.
Additionally, we stress that this decision addresses only the ability of a person to establish standing as a parent to petition for custody or visitation; the ultimate determination of whether those rights shall be granted rests in the sound discretion of the court, which will determine the best interests of the child.
V.
We conclude that a person who is not a biological or adoptive parent may obtain standing to petition for custody or visitation under Domestic Relations Law § 70 (a) in accordance with the test outlined above.
In Brooke S.B., our decision in Alison D. prevented the courts below from determining standing because the petitioner was not the biological or adoptive parent of the child. That decision no longer poses any obstacle to those courts’ consideration of standing by equitable estoppel here, if Brooke S.B. proves by clear and convincing evidence her allegation that a pre-conception agreement existed. Accordingly, in Brooke S.B., the order of the Appellate Division should be reversed, without costs, and the matter remitted to Family Court for further proceedings in accordance with this opinion.
In Estrellita A., the courts below correctly resolved the question of standing by recognizing petitioner’s standing based on judicial estoppel. In the child support proceeding, respon *29 dent obtained an order compelling petitioner to pay child support based on her successful argument that petitioner was a parent to the child. Respondent was therefore estopped from taking the inconsistent position that petitioner was not, in fact, a parent to the child for purposes of visitation. Under the circumstances presented here, Family Court properly invoked the doctrine of judicial estoppel to recognize petitioner’s standing to seek visitation as a “parent” under Domestic Relations Law § 70 (a). Accordingly, in Estrellita A., the order of the Appellate Division should be affirmed, without costs.

. The parties in both cases before us dispute the relevant facts. Given the procedural posture of these cases, our summary of the facts is derived from petitioners’ allegations in court filings and relevant decisions of the courts below.

. Petitioner appealed but, citing her financial condition, proceeded without an attorney. Her appeal was subsequently dismissed.

. We note that by the use of the term “either,” the plain language of Domestic Relations Law § 70 clearly limits a child to two parents, and no more than two, at any given time.

. Furthermore, in Matter of H.M. v E.T. (14 NY3d 521 [2010]), for purposes of child support proceedings, we construed Family Ct Act § 413 (1) (a) in a manner consistent with principles of equitable estoppel by interpreting the term “parents” to include a biological parent’s former same-sex partner, notwithstanding the lack of a biological or adoptive connection to the child (H.M., 14 NY3d at 526-527).