Matter of K.G. v C.H. (2018 NY Slip Op 04683)





Matter of K.G. v C.H.


2018 NY Slip Op 04683


Decided on June 26, 2018


Appellate Division, First Department


Gische J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 26, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Peter Tom, J.P.
Dianne T. Renwick
Judith J. Gische
Jeffrey K. Oing
Anil C. Singh, JJ.


309154/16 5186 

[*1]In re K.G., Petitioner-Appellant-Respondent,
v
C.H., Respondent-Respondent-Appellant. The Lesbian and Gay Law Association Foundation of Greater New York, Amicus Curiae.



Petitioner appeals from an order and judgment (one paper) of the Supreme Court, New York County (Frank P. Nervo, J.), entered April 13, 2017, which, after a trial, denied the petition for joint custody of the parties' child and dismissed the proceeding for lack of standing, and denied respondent's motion to the extent it sought costs and sanctions under 22 NYCRR 130-1.1.




Kaplan & Company LLP, New York (Roberta A. Kaplan and John C. Quinn of counsel), Morrison Cohen LLP, New York (Danielle C. Lesser and Andrew P. Merten of counsel), and Chemtob Moss & Forman, LLP, New York (Nancy Chemtob and Jeremy J. Bethel of counsel), for appellant-respondent.
Cohen Rabin Stine Schumann LLP, New York (Bonnie E. Rabin, Gretchen Beall Schumann, Tim James and Lindsay Pfeffer of counsel), for respondent-appellant.
Latham & Watkins LLP, New York (Virginia F. Tent, Matthew J. Pickel, Iris H. Xie and Naseem Faqihi Alawadhi of counsel), for amicus curiae.



GISCHE J.
[*2] In this action, petitioner (KG) claims that she is a parent with standing to


seek custody of and visitation with A., the adopted child of respondent (CH), her now ex-partner. KG is not biologically related to A., who was born in Ethiopia, nor did she second adopt the child. KG's claim of parental standing is predicated upon the recent landmark Court of Appeals decision in Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d 1 [2016]), which expansively defines who is a "parent" under Domestic Relations Law § 70. On appeal, KG primarily claims that in 2007, before A. was identified and offered to CH for adoption, the parties had an agreement to adopt and raise a child together. CH does not deny that the parties had an agreement in 2007, but claims that the 2007 agreement terminated when the parties' romantic relationship ended in 2009, before A. was first identified and offered for adoption to CH in March 2011. KG alternatively claims on appeal that based upon the relationship between her and A., which developed after he came to New York, this Court should find she has standing as a parent under principles of equitable estoppel. As a further alternative, KG claims that the matter should be remanded because the trial court improperly truncated the record on equitable estoppel.
After a 36-day trial, Supreme Court held that notwithstanding the parties' agreement to adopt and raise a child together, KG did not remain committed to their agreement, which terminated before the adoption agency matched A. with CH. The court denied KG standing to proceed and dismissed the petition for custody and visitation. The court did not substantively address any issue of equitable estoppel. Mid-trial, after KG's case closed, the court ruled that it was only considering KG's claims of standing based upon whether the parties had a viable plan to adopt and raise a child together.
All of the legal issues raised on this appeal have Brooke as their underpinning. In Brooke, decided only days before this proceeding was commenced, the Court of Appeals, is an opinion written by Judge Sheila Abdus-Salaam, overruled Matter of Alison D. v Virginia M. (77 NY2d 651 [1991]) and abrogated Debra H. v Janice R. (14 NY3d 576 [2010], cert denied 562 US 1136 [2011]), its earlier precedents, thereby greatly expanding the definition of who can obtain status as a parent and have standing to seek custody and visitation of a child. Although pursuant to Domestic Relations Law § 70(a), "either parent" may petition the court for custody of a child, the statute does not define that term. In Alison D., decided before Brooke, the Court of Appeals, over a prescient dissent by Chief Judge Judith Kaye, declined to construe the term parent to include nonbiological, nonadoptive parents. The effect of these earlier precedents was that only biological or adoptive parents had standing to seek custody and visitation. In deciding Brooke, the Court recognized that its narrow interpretation of "parent" under Alison D. had produced inequitable results, especially for children being raised by same sex couples. In departing from its earlier precedents, the Court of Appeals expansively defined Domestic Relations Law § 70 in Brooke, permitting nonbiological, nonadoptive parents to achieve standing to petition for custody and visitation (Brooke at 26-27). The decision was celebrated for its ground breaking recognition of the rights of members of nontraditional families (e.g. Alan Feur, New York Court Expands Definition of Parenthood, NY Times, August 31, 2016 at A17).
Closely hewing to the reasoning of Judge Kaye's dissent in Alison D., the Brooke Court recognized that parenthood was broader than biology or adoption, but it also held that the criteria to determine parenthood must be appropriately narrow to take into account the fundamental rights to which biological and adoptive parents are "undeniably entitled" (id. at 27). In this regard, the Court placed the burden of proving standing, by clear and convincing evidence, on the party seeking it (id. at 28). The Court also recognized that in order to prove standing under Domestic Relations Law § 70, more than just a loving relationship with the child was warranted (id at 26-28).
Notwithstanding the stated limitations, the Brooke court recognized that there could be a [*3]variety of avenues for a movant to prove standing. It expressly rejected the premise that there is only one test that is appropriate to determine whether a former same-sex nonbiological, nonadoptive party has parental standing. In fact, in Brooke and its companion case of Matter of Estrellita A. v Jennifer L.D., the Court of Appeals recognized each petitioner's status as a parent, but did so applying two completely different tests. The Court of Appeals also left open the possibility that a third "test," involving the application of equitable principles, such as the doctrine of equitable estoppel, could be utilized to confer standing in certain circumstances.
In Brooke, the Court of Appeals recognized that where a former same-sex partner shows by clear and convincing evidence that the parties had jointly agreed to conceive a child that one of them would bear, and also agreed to raise that child together once born, the nonbiological, nonadoptive partner has standing, as a parent, to seek custody and visitation with the child, even if the parties' relationship has ended. The Court referred to these circumstances as the parties having a preconception agreement and applied the "conception test" (id. at 27-28). In Estrellita, however, the Court resolved the question of standing differently, applying the doctrine of judicial estoppel (id. at 29). In Estrellita, the child's biological parent (Jennifer L.D.) had previously petitioned Family Court for an order requiring Estrellita A., the nonbiological, nonadoptive partner to pay child support. Jennifer L.D.'s support petition was granted and she was successful in obtaining child support from Estrellita A. Subsequently, Estrellita A. sought custody and visitation with the child, but Jennifer L.D. denied that Estrellita A. had standing as a parent. The Court of Appeals determined that Jennifer L.D. had asserted an inconsistent position in the support action, because Jennifer L.D. had successfully obtained a judgment of support in her favor and therefore, was judicially estopped denying Estrellita A.'s status as a parent given Family Court's prior determination that Estrellita A. was in fact, a legal parent to the child (id. at 29).
In deciding Brooke, the Court rejected calls by the amici and the parties that it should adopt only one, uniform test to determine standing as a parent. The Court observed that a different test might be applicable in circumstances where, for instance, a partner did not have any preconception agreement with the legal parent:
"Inasmuch as the conception test applies here, we do not opine on the proper test, if any, to be applied in situations in which a couple has not entered into a pre-conception agreement. We simply conclude that, where a petitioner proves by clear and convincing evidence that he or she has agreed with the biological parent of the child to conceive and raise the child as co-parents, the petitioner has presented sufficient evidence to achieve standing to seek custody and visitation of the child. Whether a partner without such an agreement can establish standing and, if so, what factors a petitioner must establish to achieve standing based on equitable estoppel are matters left for another day, upon a different record" (id. at 28).
Although Brooke was decided in the context of children who were planned and conceived through means of artificial insemination, the Court's reasoning applies with equal force where, as here, a child is legally adopted by one partner and the other partner claims he or she is a "parent" with co-equal rights because of a preadoption agreement (see Matter of Gardiner, 69 NY2d 66, 73 [1986] [addressing New York State's long-standing, unbroken and fundamental public policy to treat adoptive and biological children equally in family settings]).
KG contends that the 2007 agreement satisfies the conception/adoption test enunciated in [*4]Brooke. She argues that the trial court was factually mistaken in holding that the 2007 plan "abated" when the parties romantic relationship ended. KG also argues that the court should never have looked at whether the 2007 plan terminated, because once the parties made their plan, legal standing was conferred on her to seek custody of or visitation with any child that CH later conceived or adopted. We do not find these arguments persuasive. As more fully discussed, there is ample support in the record for the trial court's factual conclusion that the parties' 2007 agreement to adopt and raise a child together had terminated before A. was identified by the agency and offered to CH for adoption. Nor was the trial court's consideration of whether the plan was in effect at the time the particular child in this proceeding was identified for adoption an impermissible reformulation or restriction on the plan test originally enunciated in Brooke.
At trial, the parties stipulated that in 2007 they had an agreement to internationally adopt and raise a child together. Their plan envisioned that after CH completed an international adoption, and a child was brought to the United States, KG would second adopt that child, thereby becoming a legal parent as well. It is also undisputed that the parties' romantic relationship ended in December 2009, well before any particular child was identified by the international agency and offered to CH for adoption. The parties sharply dispute whether their agreement to jointly adopt survived the dissolution of their romantic relationship. CH contends that KG broke up with her because KG had misgivings about becoming a mother and no longer wanted to bring a child into their relationship. CH argues that the parties' conduct at the time of their breakup vitiated the 2007 pre-adoption agreement. KG contends that she remained committed to the adoption plan and continued her cooperation with it beyond the end of their romantic relationship.
While there were conflicting facts presented at trial, those conflicts were resolved by the trial court in favor of CH's position. Facts supporting the conclusion that by the time A. was identified and adopted by CH the parties no longer had a viable agreement to adopt and raise a child together include at least the following: The parties began a romantic relationship in 2004. At some point they began talking about adopting a child. In 2007 the parties jointly purchased an apartment on Sullivan Street. A cohabitation agreement, dated May 18, 2007, set forth the partes' respective rights in the apartment, which they refer to as the "familial residence." The parties agree that the cohabitation agreement was made in contemplation of, and as a foundation for, their plan to adopt and raise a child together, even though the agreement makes no reference to their planned adoption.
The parties thereafter took affirmative steps to effectuate their plan. By February 2009, the parties initiated their application for an international adoption. Only CH was listed on the application as the prospective adoptive parent; KG was identified as a household member. They agree that this was solely done to avoid the prevalent restrictions on same-sex international adoptions. Both parties participated in a preadoption home study, they were fingerprinted, and they provided extensive information about their finances.
Later in 2009, beginning in the fall and into the next winter, the parties' romantic relationship devolved. They frequently argued and made separate travel plans. Much of the unraveling of their relationship is described in email exchanges, which included content concerning whether to go forward with an adoption at that time. In one exchange KG expresses confusion about the relationship and CH responds that she is "sad" to be involved with someone who is unsure about their future together and "about building a second generation." CH also tells KG they have "lots to discuss" because she is now qualified as an adoptive parent under two programs. CH asks KG whether "we should just put the idea on hold completely until you feel good about it. Or just tank the idea completely," adding that they have to give an answer "ASAP." CH assures KG in the same email that they can "roll our relationship anyway" even though "[it] isn't perfect 100%," but in response, it is KG who expresses co-parenting might be a [*5]disservice to "a kid." KG tells CH that they will talk about "everything" on Saturday (December 12, 2009). That Saturday, KG broke up with CH, disclosing a rekindled relationship with an ex-girlfriend. Following the breakup, CH and KG continued to live together at the Sullivan Street apartment, but CH moved into the guest bedroom.
Throughout 2010, the parties began an extended process of emotionally and financially disentangling their relationship. Some of their email exchanges during this period document the shift in their relationship from romantic to friendship. The emails also capture KG's disconnection from the original plan to co-adopt and raise a child. KG's communications demonstrate her understanding that CH was now pursuing the plan to adopt and raise a child alone. For instance, in a January 2010 email sent by KG to CH, she suggests that "[y]ou could get urself (sic) a Haitian orphan." In an extended email exchange between the parties taking place over the course of two days in February 2010, KG expresses remorse about their breakup and writes to CH that she had "envisioned what it would be like for you and the kid to be here, whizzing about London together, all the dreams we've had for our future together. It makes me cry to even just write this and think I've put it all in jeopardy." CH responds that "[w]e're evolving into something else at the moment and that's brave not many couples do that."
In March 2010, CH notified KG that she had spoken to "my" case worker who had suggested that "I find another country to apply to other than Nepal" and CH says "my choice now is to take my $2,000 Nepal fee and second apply to another country" and that "at this point there have been no referrals for adoptive families who applied in 2009 with my agency . . . ."
In an email dated April 21, 2010, KG wrote to CH and suggested that "[s]ince you are the one getting a kid, would u consider staying at 181 [Sullivan Street] and have me move out? It's only me and I don't need much space" adding in a subsequent email that her needs were not as great as CH's because "you're bringing a kid into the world."
In May 2010, the parties, with the assistance of their attorneys, negotiated a separation agreement. In the separation agreement, dated May 28, 2010, the parties formally terminated their cohabitation agreement and memorialized the end of their romantic relationship. The separation agreement, among other things, provided for CH to move out of the Sullivan Street and Fire Island properties. Upon CH's execution of transfer deeds, KG would pay CH the sum of $350,000. The separation agreement made no reference, direct or oblique, to CH's adoption application. Although KG contends that the money she paid to CH was to provide her with the means to support a yet to be identified child for adoption, the separation agreement itself contains no such reference.
The parties remained in touch after the execution of the separation agreement. KG's communications continued to demonstrate that she did not consider herself a part of any ongoing plan to pursue an adoption and raise a child with CH. In a December 5, 2010 email to CH, KG, then in Bogota, Colombia, writes that "you could get a kid here so easy, they actually have ads in the paper and they're beautiful. kind of sad, but . . . ." In another December 2010 email, KG tells CH that "the reality of our relationship ending" and that there is so much "I don't even know about you anymore" has set in and that her feelings "about the baby, and how left out of that process I felt, continue to surface as the day draws near on something we started together over three years ago." KG expresses regrets about "our beautiful life now shattered." In a January 2011 email, KG again expresses sadness that she's "lost everything" including "the baby that will never be, the life that will never be."
In March 2011 the adoption agency identified and offered A., a 15 months old orphan in Ethiopia, as a "match" for adoption by CH. After CH sent a photo of A. to KG, KG sent two emails. In the first, KG writes that "I'm sure this is a big day for you. He's perfect" and in the second one, less than two hours later KG wrote:
"I can't stop looking at him. I am doing my best to temper my own [*6]emotional reaction to this and want you to know I am so proud of you for following your dream. You made this happen. He was supposed to be our son. I'm not sure I will ever get over my regret and sorrow over that. But I will be very very happy for you and for him, and hope to find a way to be in your lives."
In a May 18, 2011 email, KG wrote to CH telling her "I am so happy for you. I want you to know I will be here to support you through this . . . emotionally, financially, etc. . . . I am so melancholy that I've missed this opportunity in so many ways, but I will be here for you both however you need me." In June 2011, KG wrote to CH telling her she looked forward to updates about the child and asking CH if she felt like "he's your guy?"
CH proceeded with the adoption process and in August 2011 made plans to bring A. to New York. KG, who was in Hamburg, Germany on business, exchanged her plane ticket to meet CH and A. in London, England and fly back with them to New York. CH filed a petition for adoption in the New York Surrogate's Court; it was completed in January 2012. KG did not second adopt A. nor was that ever discussed by the parties anytime after A. was identified by the adoption agency (see Matter of Jacob, 86 NY2d 651 [1995]).
Following his arrival in New York, KG and her extended family had contact with A. CH does not dispute that KG and A. have a loving and affectionate relationship. The nature and extent to which this relationship was parent like is sharply disputed. At some point CH decided that she wanted to move to London with A [FN1]. It was the convergence of CH's desire to relocate and the Court of Appeals' decision in Brooke that precipitated KG's application.
The resolution of whether the parties' agreement remained in effect beyond the termination of the parties' romantic relationship was dependent upon facts from which differing inferences could be drawn. After weighing the evidence, and finding CH's version of the events more credible, the trial court determined that the parties' mutual intention to raise an adopted child together did not survive the end of their romantic relationship. There is more than sufficient evidence in the record supporting the trial court's finding (see Brown Bros. Elec. Contrs. v. Beam Const. Corp., 41 NY2d 397 [1977]), and we find no basis to disturb it (see Matter of Brown v Rosario, 272 AD2d 205 [1st Dept 2000])[FN2]. Contrary to KG's argument, the trial court did not determine that in every case the end of a romantic relationship, as a matter of law, ends any plan to adopt and raise a child together. It only held that under the facts of this case, the parties' preadoption agreement to jointly adopt and raise a child together ended when [*7]their romantic relationship ended.
We also reject KG's contention that the trial court was precluded under the doctrine of law of the case from making findings that the parties' agreement was no longer viable at the operative time, just because CH's motion to dismiss at the close of KG's case was denied. A decision on a motion to dismiss, in which the non-movant is given every favorable inference, does not preclude a different factual determination once all the evidence is before the court (RXR WWP Owner LLC, v WWP Sponsor, LLC, 145 AD3d 494 [1st Dept 2016]; Bodtman v Living Manor Love, Inc., 105 AD3d 434 [1st Dept 2013]).
KG argues that, on the issue of standing, once the existence of the 2007 agreement was established, the trial court should not have inquired further. KG's argument essentially is that if parties at any point in time agree to jointly conceive or adopt and raise children, that agreement is a predicate for standing to seek custody/visitation of any after born and/or adopted child of either party, no matter the circumstances. We do not believe that even the most expansive definition of who is a "parent" supports this sweeping interpretation.
Contrary to KG's argument, the trial court's consideration of whether the preconception/adoption plan was still in place at the operative time is not inconsistent with Brooke, because the issue was never raised, nor considered, by the Court in Brooke. There was no dispute in Brooke that the parties' plan to conceive and raise children together was in place when the children were conceived.
The trial court's inquiry is consistent with the salutary goal of Brooke. It serves the ameliorative purpose of allowing a nonbiological, nonadoptive parent a means of achieving standing, while also heeding Brooke's requirement that criteria to determine parenthood must also take into account the rights of the biological and adoptive parents. The parties in this case had a preadoption agreement, but when the agreement terminated, no child had yet been identified for adoption. Consequently, from the time the plan was formulated and going forward up until the time the plan ended, neither partner could be identified as a "parent" under Domestic Relations Law § 70. A. was not offered to CH for adoption until almost 15 months later. This situation is distinguishable from Brooke, where the plan was still in effect at the time the children were conceived. KG's position that any agreement made at any time confers standing would result in perpetual standing to seek custody and/or visitation as to any after born and/or adopted children of either party, regardless of whether and for how long before the conception and/or adoption parties went their separate ways. More significantly, it would be regardless of what the parties actually intended. The purpose of Brooke is to protect parental relationships in nontraditional families, not to mechanically confer standing at a time when (and for children that) the parties never intended to co-parent. The requirement that the plan be in effect at the time a child is identified does not add any heightened barrier for same sex families. It applies equally to nonmarried, nonadoptive parents, whether in same sex or heterosexual relationships. Even standing based upon biology requires that an actual child be identified.
Contrary to KG's arguments, this legal analysis does not eviscerate Brooke. If the parties have a plan in place when a particular child is identified, then they become parents under Domestic Relations Law § 70 at that time, with standing thereafter to seek custody/visitation in the event of a change in the household.
KG alternatively raises arguments on appeal with respect to equitable estoppel. In Brooke, the Court of Appeals acknowledged that equitable estoppel could be considered an independent basis to establish standing under Domestic Relations Law § 70. The actual issue of standing in Brooke, however, was resolved based upon the parties' plan to conceive and jointly raise children. Consequently, other than acknowledging it as a separate theory of standing, Brooke never decided any substantive legal issues regarding equitable estoppel. The Court expressly stated that the factors necessary to establish equitable estoppel would have to wait for [*8]another day on another record (28 NY3d at 28).
Unlike Brooke, in this case the trial court ultimately found, and we agree, that there was no preadoption plan in effect that made KG a parent of A. Consequently, KG was free to try and establish standing under an alternative theory of equitable estoppel. Notwithstanding that each of the parties urges this Court to rule on what substantive factors are necessary to establish equitable estoppel, we decline to do so because the record developed at trial is incomplete and will not support such a sweeping decision.
KG makes several arguments on appeal concerning equitable estoppel. She argues that based upon the evidence presented, and relying on the factors enunciated, but not ruled upon, by the trial court, this Court should find in her favor on the issue of equitable estoppel. Alternatively, KG argues that the matter should be remanded for a continued hearing on equitable estoppel, because she was prevented from developing a full record. In particular, KG argues that the court repeatedly denied her applications to appoint an attorney for the child and refused to permit her expert witness, a psychologist, to testify. In opposition, CH argues that the trial court's decision should be affirmed because KG failed to prove CH's consent, a necessary element of equitable estoppel.[FN3]
Although the original petition did not expressly state that KG was claiming standing under Domestic Relations Law § 70 under an alternative theory of equitable estoppel, the issue was raised early on in the proceeding by the trial court itself. In September 2016, well before KG closed her case, the issue had not only been raised, but the court posited an nonexhaustive list of factors that needed to be considered on the issue. Although there was also ongoing colloquy about whether KG's bare-boned petition was sufficient to raise an equitable estoppel claim, given the introduction of the issue early on in the proceedings, the parties had sufficient notice and the trial court should have allowed them the opportunity fully develop the issue on the merits.
KG was actually given fairly wide latitude to present relevant evidence on the issue of equitable estoppel. Her evidence included the extent and nature of her relationship with A. once he came to New York. While this evidence was also relevant to whether the parties acted in conformity with an ongoing oral agreement to jointly adopt and raise a child, it is the same evidence that KG relies upon to argue on this appeal that she has established parenthood by equitable estoppel. Other than issues regarding an attorney for the child and disallowance of testimony by the psychologist proffered by her as an expert, KG makes no other arguments on appeal about offered proof that was disallowed at trial.
At the conclusion of KG's prima facie case, in a written decision dated January 6, 2017, the court denied CH's motion to dismiss the petition, finding that KG had made out a sufficient showing of a plan to jointly adopt and that the hearing on standing should go forward to conclusion. The court did not address the equitable estoppel issue. At a January 24, 2017 court appearance, however, the court expressly stated that it would not be ruling substantively on the [*9]equitable estoppel issue because it was not raised in KG's papers; it was not pleaded [FN4]. KG's attorney objected, but faced with the court's ruling, she sought to preclude CH from presenting evidence opposing equitable estoppel. The court granted KG's application.
KG's request on appeal, that this Court now decide equitable estoppel in her favor on the record as developed at trial, must be denied. At the very least, denial is warranted because CH was foreclosed from putting in evidence opposing this issue. Having truncated CH's ability to present opposing evidence on the issue of equitable estoppel at the trial level, KG cannot, on appeal, obtain a judgment in her favor on the merits. The matter cannot be decided without CH having the opportunity to be heard and on an otherwise patently incomplete record (see Public Serv. Mut. Ins. Co. v Fireman's Fund Amer. Ins. Cos., 71 AD2d 353, 354 [1st Dept 1979]).
The record is incomplete in other respects as well, precluding this Court from reaching the merits of the parties' respective substantive claims on the issue of equitable estoppel on this appeal. KG validly argues that any case involving parenthood by equitable estoppel should provide a viable means by which the child's voice is heard [FN5]. From the outset of the proceeding, the trial court denied repeated requests by KG's attorney for the appointment of an attorney for the child, a forensic evaluation and/or a Lincoln hearing. Thus, the record is devoid of any means [*10]by which A.'s interest in the parties' dispute is voiced to the court.[FN6]
Although prior to Brooke the doctrine of equitable estoppel was not available to establish standing on behalf of nonbiological, nonadoptive parents, it has been relied upon by New York courts in resolving many family disputes involving children. For instance, the legal doctrine has been applied to prevent an adult from denying paternity where a child has justifiably relied upon the representations of a man that he is the father and a parent-child relationship has developed (Matter of Shondel J. v Mark D, 7 NY3d 320, 326 [2006]). It has been applied to prevent a mother from challenging her husband's paternity (Matter of Sharon GG. v Duane HH., 63 NY2d 859 [1984], affg 95 AD2d 466 [3d Dept 1983]). It has also been applied to prevent a biological father from asserting paternity when he has acquiesced in the establishment of a strong parent-child bond between the child and another man (Matter of Cecil R. v Rachel A., 102 AD3d 545, 546 [1st Dept 2013]). Recently, it was successfully invoked to prevent a sperm donor from asserting paternity to a child born in an intact marriage (Matter of Joseph O. v Danielle B., 158 AD3d 767 [2d Dept 2018]). A unifying characteristic of these cases is the protection of " the status interests of a child in an already recognized and operative parent-child relationship'" (Shondel, 7 NY3d at 327, quoting Matter of Baby Boy C., 84 NY2d 91, 102n [1994]). Equitable estoppel requires careful scrutiny of the child's relationship with the relevant adult and is ultimately based upon the best interest of the child (see Shondel at 326; see also Family Court Act § 418). Likewise, in the context of standing under Domestic Relations Law § 70, equitable estoppel concerns whether a child has a bonded and de facto parental relationship with a nonbiological, nonadoptive adult. The focus is and must be on the child (Brooke, 28 NY3d at 27). It is for this reason that the child's point of view is crucial whenever equitable estoppel is raised.[FN7]
Although the appointment of an attorney for the child is discretionary (Quinones v Quinones, 139 AD3d 1072, 1074 [2d Dept 2016]; Matter of Ames v Ames, 97 AD3d 914, 916 [3d Dept 2012], lv denied 20 NY3d 852 [2012]), it is commonplace and should be the norm where the issue raised is equitable estoppel. This is because equitable estoppel necessarily involves an analysis and determination of what is in the best interests of the child (see Shondel J., 7 NY3d at 326; Matter of Augustine A. v Samantha R.S., 138 AD3d 458 [1st Dept 2016]); Matter of Darlene L.-B. v Claudio B., 27 AD3d 564 [2d Dept 2006]). Even if a court denies the appointment of an attorney for the child, there are alternative means to obtaining this information, including a forensic evaluation or a Lincoln hearing. Here, the child's voice is totally silent in this record.
We reject, however, KG's argument that the trial court improperly refused to allow a [*11]psychologist retained by her to testify about the general effects of separating a child from someone the child loves. The psychologist, who had never met A., could offer no relevant information about the child's relationship with KG or other relevant opinions on the issue of equitable estoppel.
In view of our conclusion that the record is incomplete, we do not reach CH's argument that because CH did not consent to holding KG out as a parent, KG cannot prove equitable estoppel. While some courts in other jurisdictions consider consent of the biological/adoptive parent an outcome determinative factor in equitable estoppel cases (see e.g. Pitts v Moore, 90 A3d 1169, 1179 [Me Sup Jud Ct 2014]; Matter of Parentage of LB, 155 Wash 2d 679, 708, 122 P3d 161, 176 [2005], cert denied 516 US 975 [1995]; In re Custody of H.S.H.-K., 193 Wis 2d 649, 694-695, 533 NW2d 419, 435-436 [1995], cert denied 516 US 975 1995]), New York has not yet formulated any dispositive test. Judge Kaye, in her dissent in Alison D., generally posited that the test for someone claiming standing on the basis of loco parentis should require that the relationship with the child came into being with the consent of the biological or legal parent (77 NY2d at 661-662). Notwithstanding that Judge Kaye favored consent as a factor in determining issues of de facto parenthood, she also would have remanded the matter to the trial court to devise an actual test. Brooke, although liberally citing Judge Kaye's dissent, did not reach this issue all.
We recognize that not every loving relationship that a child has with an adult will confer standing under Domestic Relations Law § 70, no matter how close or committed. It requires a relationship that demonstrates the relevant adult's permanent, unequivocal, committed and responsible parental role in the child's life. The underpinning of an equitable estoppel inquiry is whether the actual relationship between the child and relevant adult rises to the level of parenthood. Anything less would interfere with the biological or adoptive parent's right to decide with whom his or her child may associate (Troxel v Granville, 530 US 57 [2000]; Brooke at 26 [recognizing that any expansion of the definition of parent must be appropriately narrow to account for the fundamental liberty rights of biological and adoptive parents]). Consent, whether express or implied, is an important consideration that bears upon the issue. It may be that in this case the issue of CH's consent becomes a predominant consideration in the ultimate determination of whether equitable estoppel can be established. We only hold that the record developed at trial does not permit us to make the full consideration necessary to finally determine the issue of equitable estoppel at this point.
Because the record on equitable estoppel is incomplete, we remand this matter for further proceedings consistent with this decision. We find no basis for KG's further request that the matter be reassigned to a different judge.
On the cross appeal we find that the Supreme Court providently exercised its discretion in denying sanctions against KG in the form of CH's legal fee (Matter of Alissa E. v Michael M., 154 AD3d 526 [1st Dept 2017]). Although the Supreme Court ultimately decided disputed factual matters in CH's favor, it does not mean that KG's assertions of material factual statements at trial were false (22 NYCRR 130.1-1).
Accordingly the order and judgment (one paper) of the Supreme Court, New York County (Frank P. Nervo, J.), entered April 13, 2017, which, after a trial, denied the petition for joint custody of the parties' child and dismissed the proceeding for lack of standing, and denied respondent's motion to the extent it sought costs and sanctions under 22 NYCRR 130-1.1, should be modified, on the law and the facts, and the
matter remanded for further proceedings consistent herewith, and otherwise affirmed, without costs.
M-5695 - In re K.G. v C.H.
Motion for leave to file amicus curiae brief granted, and the brief deemed filed.
All concur.
Order and judgment (one paper), Supreme Court, New York County (Frank P. Nervo, J.), entered April 13, 2017, modified, on the law and the facts, and the matter remanded for further proceedings consistent herewith, and otherwise affirmed, without costs.
Opinion by Gische, J. All concur.
Tom, J.P., Renwick, Gische, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 26, 2018
CLERK



Footnotes

Footnote 1:CH is originally from London and has extended family there.

Footnote 2:We reject KG's collateral argument that the trial court improperly considered evidence of events occurring after the adoption in reaching this conclusion. On KG's affirmative case she testified to after adoption events and called witnesses, including family members, who also so testified. This evidence bore upon whether the parties were acting in a manner consistent with their intended plan, providing at least circumstantial evidence that the parties' agreement had not terminated (see e.g. Messner Vetere Berger McNamee Schmetterer Euro RSCG v Aegis Group, 93 NY2d 229 [1999]; Martin v Peyton, 246 NY 213, 218 [1927]). Once raised by KG, the court was entitled to weigh such evidence in making its decision.

Footnote 3:At oral argument of this appeal CH additionally argued that KG waived any equitable estoppel arguments at trial. Although KG's primary position was that the parties had a preadoption agreement, we do not find any knowing or voluntarily withdrawal of arguments regarding equitable estoppel (see L.K. Comstock & Co. v New York Convention Ctr. Dev. Corp., 179 AD2d 322 [1st Dept 1993]). When the court stated that it would not consider equitable estoppel, KG's attorneys expressed their disagreement with the court's ruling. 

Footnote 4:The court stated in colloquy: "I reviewed the papers and noted that nowhere in your papers did you raise, on behalf of petitioner, the estoppel issue. The evidence having been heard, at the conclusion of your case I ruled on the matter with respect to what you in fact pled, a plan to adopt and raise a child together. We'll limit ourselves to that factor alone from this point forward; all understand?"

Footnote 5:In New York State, even the youngest of children is entitled to have his or her point of view heard in cases involving custody and/or visitation. Pursuant to The Rules of the Chief Judge (22 NYCRR) § 7.2[d]), an attorney for the child must zealously advocate a child's position where the child is capable of knowing, voluntary and considered judgment. If the attorney for the child is convinced that the child lacks capacity for knowing, voluntary and considered judgment, the attorney for the child may advocate a position that is contrary to the child's wishes (Venecia V. v August V., 113 AD3d 122, 127-128 [1st Dept 2013]). The age of a child may inform the attorney for the child's conclusion regarding the child's capacity and the attorney for the child's duty to exercise substituted judgment (Audreanna VV. v Nancy WW., 158 AD3d 1007 [3d Dept 2018] [attorney for the child properly exercised substituted judgment given children' ages, disabilities and the grandmother's hostility to the mother]; Matter of Hassina S. v Nadia S. 59 Misc 3d 1202[A], 2018 NY Slip Op 50350[u] [Family Ct, Monroe County 2018] [attorney for the child properly substituted judgment for a two year old]). Thus, even a child as young as A. at the time of the hearing, should have had his interests expressed to the court, separate and apart from those of the adult parties to the proceeding.

Footnote 6:Before KG closed her case her attorneys asked to recall KG to the stand to testify about conversations she had with A. The court expressed skepticism about the admissibility of such statements because they were hearsay. Nonetheless the court ruled that KG could be recalled and that it would rule on the objections question by question. KG, however, decided not to retake the stand.

Footnote 7:We recognize that the nature of equitable estoppel in some circumstances may require substituted judgment because the petitioning adult may be a stranger to the child. Nonetheless, facts about who the child regards as his or her parent my be elicited from the child his or herself.